# Zwiercan v. General Motors Corp.

*Marc P. Weingarten,* for plaintiff.
*John J. O'Donnell* and *John E. O'Neil,* for defendant.

BERNSTEIN, *J.,* October 4, 2004—The sole issue before this court is whether the prerequisites for certification are satisfied. The purpose behind class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996). For a suit to proceed as a class action, Rule 1702 of the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

"In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dis-

positive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

"(b) Where equitable or declaratory relief alone is sought, the court shall consider

"(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

"(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

"(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b)."

The burden of showing each of the elements in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.' " *Cambanis v. Nationwide Insurance Co.,*

348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985). The moving party need only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." *Debbs v. Chrysler Corp.*, 810 A.2d 137, 153-54 (Pa. Super. 2002) (quoting *Janicik v. Prudential Insurance Co. of America*, 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982)).

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable claim," "substantial evidence," or evidence that creates a rebuttable presumption that requires the opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element . . . ." *Commonwealth v. Martin*, 727 A.2d 1136, 1142 (Pa. Super. 1999), *alloc. denied*, 560 Pa. 722, 745 A.2d 1220 (1999). However, "the weight and credibility of the evidence are not factors at this stage . . . ." *Commonwealth v. Marti*, 779 A.2d 1177, 1180 (Pa. Super. 2001).

In the family law context, "the term 'prima facie right to custody' means only that the party has a colorable claim to custody of the child." *McDonel v. Sohn*, 762 A.2d 1101, 1107 (Pa. Super. 2000). Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the opposing party to affirmatively rebut that evidence. See *e.g., Williamsburg Community School District v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission*, 99 Pa. Commw. 206, 512 A.2d 1339 (1986).

Courts have consistently interpreted the phrase "substantial evidence" to mean "more than a mere scintilla," but evidence "which a reasonable mind might accept as adequate to support a conclusion." *SSEN Inc. v. Borough Council of the Borough of Eddystone,* 810 A.2d 200, 207 (Pa. Commw. 2002). In *Grakelow v. Nash,* 98 Pa. Super. 316 (1929), a tax case, the Superior Court said: "To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made; . . . it attributes a specified value to certain evidence but does not make it conclusive proof of the fact in question."

Class certification is a mixed question of fact and law. *Debbs v. Chrysler Corp.,* 810 A.2d 137, 154 (Pa. Super. 2002). The court must consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707(c). In determining whether the prerequisites of Rule 1702 have been met, the court is only to decide who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. 1977 explanatory comment to Pa.R.C.P. 1707. Where evidence conflicts, doubt should be resolved in favor of class certification. In making a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454. Accordingly, this court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses and the substantive merits of defenses raised.

"The burden of proof to establish the five prerequisites to class certification lies with the class proponent; however, since the hearing on class certification is akin to a preliminary hearing, it is not a heavy burden." *Professional Flooring Co. v. Bushar Corp.,* 61 D.&C.4th 147, 153 (Montg. Cty. 2003), citing *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153 (Pa. Super. 2002); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). See also, *Baldassari v. Suburban Cable TV Co. Inc.,* 808 A.2d 184, 189 (Pa. Super. 2002); *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 501 A.2d 635 (1985). The prima facie burden of proof standard at the class certification stage is met by a qualitative "substantial evidence" test. The burden of persuasion and the risk of non-persuasion however, rests with the plaintiff.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action. *Weismer by Weismer v. Beech-Nut Nutrition Corp,* 419 Pa. Super. 403, 407, 615 A.2d 428, 431 (1992). See also, *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454, citing and quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir. 1968) ("in a doubtful case . . . any error should be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in doubtful cases, any error should be committed in favor of allowing class certification." *Foust v. SEPTA,* 756 A.2d 112, 118 (Pa. Commw. 2000). This philosophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later develop-

ments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 305 Pa. Super. at 129, 451 A.2d at 454.

Within this context, the court will examine the requisite factors for class certification.

## I. NUMEROSITY

To be eligible for certification, appellant must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should such potential plaintiffs sue individually." *Temple University of the Commonwealth System of Higher Education v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaning Co. v. Bell of Pa.,* 293 Pa. Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin Inc. v. Bell Telephone Company of Pennsylvania,* 291 Pa. Super. 40, 435 A.2d 208 (1981) (204 plaintiffs sufficiently numerous). Appellant need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia [to the court] that more members exist than it would be practicable to join." *Janicik,* 305 Pa. Super. at 132, 451 A.2d at 456. There is no question that the number of potential claimants alleged to be part of this class meet the numerosity requirement.

## II. COMMONALITY

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa.R.C.P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Janicik, supra* at 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beech-Nut Nutrition Corp.*, 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). However, where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. *Janicik, supra* at 133 n.5, 451 A.2d at 457 n.5.

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley*, 347 Pa. Super. 441, 452, 500 A.2d 1137, 1142 (1985). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.*, 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). (emphasis in original) Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. *Cook v. Highland*

*Water and Sewer Authority,* 108 Pa. Commw. 222, 231, 530 A.2d 499, 504 (1987).

Related to this requirement for certification is whether trial on a class basis is a fair and efficient method of adjudication under the criteria set forth in Rule 1708.

## 1. *Predominance of Common Questions of Law and Fact*

Another important requirement in determining whether a class should be certified are the requirements of Rules 1702(a)(5) and 1708(a)(1); whether common questions of law and fact predominate over any question affecting only individual members. In addition to the existence of common questions of law and fact, plaintiffs must also establish that the common issues predominate. Accordingly, the analysis of predominance under Rule 1708(a)(1) is closely related to that of commonality under Rule 1702(2). *Janicik, supra* at 141, 451 A.2d at 461.

Since the criteria of Rule 1702(2) and (5) have not been met by the proofs presented at the class certification hearing or the record presented therein, no discussion of the other requirements for certification is necessary.

Plaintiff's claim for certification is based on the contention that a single uniform design defect in the front seats of numerous vehicles manufactured by defendants make them extraordinarily dangerous in the event of rear-end collision, creating such a likelihood of death or serious bodily injury that defendants violated the Pennsylvania UTPCPL, and that reliance by the purchaser can

be presumed on a class basis without individualized proof.[1]

Plaintiff proposes to certify a class for trial as follows:

"All residents of the Commonwealth of Pennsylvania who own, for personal use, any of the automobiles identified on the list attached as exhibit one hereto . . . ." [not published herein] The list of automobiles and models proposed for class inclusion has changed from the time of filing of the complaint, and plaintiff in her memorandum in support of class certification concedes that no final class designation can be designated until the time of trial. In a footnote in plaintiff's motion for class certification, plaintiff claims to specifically reserve the right to amend the vehicles of the class.

---

1. Summary judgment based on the need for proof of individual reliance for UTPCPL claim (as set forth in *Debbs v. Chrysler,* 810 A.2d 137 (Pa. Super. 2002)), was denied by the Honorable Gene Cohen on the following basis: "In the instant case, there can be no doubt as to the materiality of the alleged defect. As more fully outlined in the court's September 11, 2002 opinion, plaintiff has alleged defect in the front seats of defendant's class vehicles are likely to cause paralysis or even death. *Zwiercan v. General Motors Corporation,* 58 D.&C.4th 251 (Phila. Cty. 2002). It is further alleged that defendant deliberately withheld its knowledge of this material and potentially life-threatening defect. Given the severity of the consequences at issue in *Zwiercan,* materiality cannot be questioned. Therefore, this court finds plaintiff is entitled to a class-wide presumption of reliance where it can be proven that the defect may cause serious bodily harm or death." While this court is aware of the decision in *DiGregorio v. Keystone Health Plan East,* 840 A.2d 361 (Pa. Super. 2003), abrogating the concurrent jurisdiction rule where a prior judge has made a palpable and demonstratable error of law, the court finds this extraordinary remedy not applicable and that the ruling of Judge Cohen on summary judgment is the law of the case.

In support of her motion for class certification, plaintiff relies on the testimony of two experts, Alan Cantor, an engineering consultant who has worked for 30 years in the research and development of automobile occupant seating, occupant restraint systems, and occupant crash protection devices, and Randall Whitfield, a statistical consultant, president and director of Quality Control Systems Corporation, who for 17 years has provided statistical and programming services for public health research regarding accidents and injuries. Both are qualified to offer opinions in their field of expertise. Their expert opinion evidence was presented by report, neither testified in court.

For the reasons set forth below, individual issues predominate and the requirements for class certification have not been met and class certification is denied.

Even though the class of vehicles proposed for inclusion in this class action has repeatedly changed during the course of the litigation, and even though plaintiff's counsel is unwilling to definitively restrict the vehicles to those proposed for inclusion at the time of the certification hearing, at least nine model years of vehicles are proposed for inclusion. Within these-model years are more than 55 separate models manufactured by seven General Motors divisions. The class includes distinct types of vehicles having significantly different seating configurations. The cars are of significantly different sizes and weights. The proposed class includes four-door sedans, coupes, station wagons, sports cars, mini vans, convertibles, and large and small SUVs. The vehicles requested for inclusion in this class include the GL Metro, a compact car, and the Chevy Tahoe, a large SUV.

No party presented any live expert testimony. The record contains the reports of four experts: Alan Cantor, Randall Whitfield, Joseph Rice, and William E. Wecker. All experts, including plaintiff's experts, concede that numerous factors affect the risk of injury in a rear-end collision. According to plaintiff's expert Cantor, the collapse of a seat is a function of the car and the passengers that are in it.[2] Expert Cantor admits: "Again it's a function of the car, the person's weight, and the factors of the impact and structural integrity of the vehicle."

"Q. All those factors can vary from car to car and accident to accident?

"A. Absolutely."

Plaintiff's expert further concedes that the class vehicles differ in length, width, curb weight, gross vehicle weight, drive train, rear bumper overhang, type of body construction, seating position and every other dimension.[3] Plaintiff's expert Cantor concedes that the bumper height may affect the potential for injury and that bumper height is a function not only of the type of vehicle involved in the accident but also the specifics of the crash itself.

Plaintiff's expert says:

"Q. If override occurs in a crash, would you expect the potential for injury to be different than if under ride occurred?

"A. Maybe . . . depending on the severity, in some crashes the override or under ride characteristics may help lower acceleration in the occupant compartment. In

2. Dep. volume 1, 45: lines 10-14, page 52, lines 11 through 17.
3. Cantor deposition page 81, line 7 to page 82, line 10.

others it may induce intrusion. So it really depends on the specifics of the crash itself."[4]

Defendant's expert Rice entirely concurs with plaintiff's expert Cantor's opinion that these individual differences in vehicle shape, size and construction can affect the likelihood of injury in a rear-end collision.

Plaintiff's expert also concedes that "head restraints can differ all over the place. They can differ in height, they can differ in adjustability. Some of the headrests General Motors uses are adjustable, some are fixed head rests. Some are—some have a slight forward angle, some have no forward angle. Some have a larger width than others. There is a tremendous inconsistency in the GM headrest."[5] Likewise he concedes "GM uses certain families of adjusters but there is no common adjuster."[6] Likewise the expert agreed that there is no such thing as a single or common GM recliner.[7]

Plaintiff's expert also concedes that the force on the seat occupant can be affected by weight and acceleration:

"Q. So a higher weight person is going to have a seat defect more than a lower weight person?

"A. Given everything else being equal in the same crash."[8]

Despite his concessions and description of the numerous factors that go into the likelihood of injury in a rear-end collision, plaintiff's expert offers the general opin-

---

4. Volume 2, page 109, line 5 to page 111, line 6.
5. Cantor deposition, volume 1, page 101, lines 11 through 19.
6. Deposition volume 1, page 103, lines 15 through 18.
7. Cantor deposition volume 1; page 107, lines 1 through 4.
8. Volume 1, page 259, lines 2 through 10.

ion that over 55 separate models of a vast variety of vehicle types and styles and configurations are all defective. Plaintiff's expert's theory rests on the assumption that there is a single GM seat and a single GM construction of the seat in each of the class vehicles. This factual assumption is unsupported by the record. He claims to supplement his opinion with specific evaluations he performed in other personal injury lawsuits, an experiment of one seat taken from a 1994 Saturn evaluated outside of the context of its vehicle seating configuration, and seat strength testing results on AR9 seats removed from nine GM vehicles. He also reviewed a rear-moving barrier test videotape of a single 1994 Saturn vehicle and reviewed strength test results on 19 seats from unidentified GM vehicles. He also reviewed a sled test conducted on an unidentified GM production seat from an unidentified GM vehicle.

Mr. Cantor takes the results of this experiment, his prior opinions generated for litigation and his vast experience in the field, and opines that all front seats in any class vehicle are insufficiently strong and will collapse in a moderate speed rear impact therefore posing a severe and unreasonable, significant risk of serious personal injury. He concludes that all the seats in all the class vehicles will perform substantially the same and expose all occupants to the same unreasonable risk of injury. Plaintiff's expert Cantor concedes that the other vehicles manufactured by the defendant are not defective.

Although he presents no universal condemnation of GM seats, he renders his opinion on a list of vehicles different from the proposed definition of class vehicles. He includes 1999 and 2000 model year vehicles, the 1990

through 1996 Buick Estate Wagon, the 1997 and 1998 Cadillac Eldorado, the 1998 Cadillac Seville, the 1997 to 2000 Cadillac Cateria, the 1991 to 1998 Chevrolet Celebrity, and the 1991 to 2000 Saturn models, none of which are proposed for inclusion in the class.

A detailed analysis of the seats which were in fact reviewed by expert Cantor reveals that seat strength tests occurred on two types of GM vehicle seats, the AR9 and AM6. There are at least 25 different types of seats in the class vehicles and all AR9 seats are not the same, nor do they perform similarly. Additionally, street strength tests were performed on not more than nine out of the 69 vehicle makes and models proposed for inclusion. The rear-moving barrier tests reviewed were performed only on Saturn vehicles. Saturn vehicles are not included in the class definition.

Plaintiff's expert has failed to take into any account in his analysis the significant differences among the vehicles of the proposed class. The limited investigation performed by plaintiff's expert involves theoretical evaluations analyzed outside of the context of the totality of the vehicle configuration. Plaintiff Zwiercan's vehicle is a 1997 Chevrolet Blazer. Plaintiff's expert did not conduct any investigation or even any inspection of that vehicle. Defendant's expert Rice presents a chart of eight different types of GM seats in the proposed class vehicles, no contrary opinion by any expert is of record. At exhibits C, D and G of expert Rice's report he describes how the complexity of these seat configurations has not been addressed by plaintiff.

Expert Cantor's analysis is further flawed because it is exclusively based on a single criteria, rearward

strength. This analysis flies in the face of his repeated concessions that numerous other factors including vehicle characteristics, occupant characteristics, and the particular circumstances of each collision affects seat performance and injury potential.

Likewise, because numerous factors must properly enter in any safety evaluation, the testing on which Cantor relies is divorced from reality. Testing on seats taken from the vehicles for strength testing cannot provide definitive proof of how a seat will perform with every occupant under every rear-end accident scenario. This is conceded by expert Cantor in the numerous concessions of all the various factors which must necessarily go into evaluating any vehicle seating system. No explanation or justification for ignoring these acknowledged significant factors is offered.

The only other expert testimony by report provided by plaintiff is that of Randall Whitfield. Mr. Whitfield is a statistical consultant, president and director of Quality Control Systems Corporation. For 17 years he has provided statistical and programming services for public health research on accidents and injuries. Mr. Whitfield does not render any opinion on Ms. Zwiercan's vehicle and concedes he does not even know what vehicle Ms. Zwiercan owns. Mr. Whitfield was not asked to study the risk of injury or death in class vehicles and of course did not do so. Mr. Whitfield was only asked to analyze the potential for seat collapse in rear-end collisions generally. From an analysis of nationwide data, he projected an annual estimate of rear-end collisions in Pennsylvania.

Mr. Whitfield analyzed General Estimate System (GES) data from 1988 reporting rear-impact collisions

and Crashworthiness Data System (CDS) data of all police-reported motor vehicle crashes in the United States between 1995 and 2000 where a vehicle was towed from the scene.[9] Based on GES data he determined that 10,000 front seat occupants had been incapacitated or killed. From CDS information he concluded that 7 percent of front occupants had moved from the upright or slightly reclined to the full rearward position following an accident. Mr. Whitfield did not analyze the data to determine whether any of the occupants in class vehicle seats which were found in a fully reclined position following an accident were injured:

"Q. OK, I am correct that your study did not attempt to quantify the number or risk of injury to people that were riding in those vehicles?

"A. It did not." [10]

He did not perform any such analysis of injury although this analysis could have been performed using the same database. No evaluation whether or not any of the individuals whose vehicle seat ended in a fully reclined position were in fact injured was presented by plaintiff at the certification hearing.

Plaintiff's expert Whitfield determined that in 1998, the police nationwide reported 15,000 rear-end collisions where at least one vehicle required towing.[11] Using this data, he opined that there were 10,000 front seat occupants who were incapacitated, injured or killed in such accidents. That data, projected onto vehicles manufactured between 1995 and 2000, led Mr. Whitfield to the

9. (Whitfield report at 1-2.)

10. Deposition of Whitfield, page 168, lines 7 through 10.

11. Whitfield report at 6.

conclusion that the seatbacks of 7 percent of front occupants moved from an upright or slightly reclined position to a full rearward position following impact. The database relied on for 1998 involved 1,768 towed vehicles involved in a rear-impact collision. This projected to 162,222 vehicles nationwide in 1988. Expert Whitfield projected that 10,323 occupants had been killed or incapacitatingly injured nationwide in 1988.

Reviewing Crashworthiness Data System, which is a random sample of all police reported crashes between 1995 and 2000 where a vehicle was towed from the scene, expert Whitfield located 349 front seat occupants where the data contained information on front seat position, post-impact. Of these 349, approximately 10 percent or 35 seats had moved to a fully reclined position post-impact. Expert Whitfield then extrapolated from these 35 occupants of post-impact fully reclined seats to a projection of 13,270 such events nationwide.

This analysis is lacking in several significant respects. The cars on which Mr. Whitfield's opinion is based differs from the definition of class vehicles. For example, 1999 model year vehicles are included in the analysis but not in the class. 1990 to 1992 Chevrolet Sprint vehicles are included in the analysis but not in the class. The 1990 Pontiac Sunbird, the 1990 to 1992 Pontiac Flier Fly, the 1997 to 1999 Cadillac Cateria, the 1990 to 1999 Chevrolet Suburban and the 1991 to 1999 Saturn models are all included in the analysis but not in the class. Expert Whitfield was not aware that non-class vehicles had been included in his analysis, and obviously therefore made no calculation as to whether their inclusion is significant or insignificant to his conclusion. In addition

to using the wrong vehicles, not one class vehicle (which begins with model year 1990 vehicles) could possibly have been included in the data from which his extrapolations were made, or in his analysis, because the data analyzed ended in 1998.

Nonetheless, expert Whitfield's analysis of CDS data revealed that of the 349 occupants of rear-end collisions for which there was post-accident position information, 35 front seats had moved to a fully reclined position.[12] Of the 35 vehicles on which these seatback "failures" were found, five were found in Saturn vehicles. Saturn vehicles are not in the proposed class. Accordingly, fully one-seventh of the 35 examples upon which expert Whitfield's opinions are based are totally irrelevant to any accurate statistical analysis of potential injuries in class vehicles. Mr. Whitfield learned of this significant over-reporting of seat failure relative to class vehicles at his deposition. Nonetheless, no subsequent analysis was undertaken. Plaintiff made no attempt to demonstrate to the court the effect of this one-seventh over-reporting in the number of vehicles whose front seats failed. Defendant's expert William E. Wecker Ph.D.'s report did analyze and compare injuries in class vehicles to injuries in non-class vehicles. Given that plaintiff has presented no rebuttal evidence, this analysis must be accepted as more accurate than plaintiff's analysis which is demonstrably based on overstated numbers.

Mr. Whitfield's explanation as to why a database excluding all class vehicles was used is completely inapposite to justifying the validity of his extrapolations. He

12. Whitfield report at 4; Whitfield dep. page 132, line 4 to page 132, line 12.

explained that the study contained no class vehicles because the analysis was performed only to demonstrate what defendant GM knew or should have known about accident frequency. If this was the intention with which the study was designed, then no extrapolation to class certification vehicles was ever intended or designed into the study, further questioning its validity. The 1988 GES data is further polluted from reasonable analysis relevant to the class certification question because heavy trucks, motorcycles, buses and other "unknown" vehicles are contained in the database. No such vehicles are contained in the proposed class vehicles.

Further, Dr. Whitfield's opinion on Pennsylvania accidents based upon national GES data was formed with the unanalyzed assumption that projection from this national data is consistent with available Pennsylvania data. The same data on which Mr. Whitfield's nationwide results were obtained could have been isolated to Pennsylvania and analyzed for accidents in Pennsylvania alone. Instead of using the actually recorded data and without any explanation or justification, only an extrapolation was performed, and only an extrapolation was offered into evidence.

The database used is inadequate for other reasons. The data used by expert Whitfield does not identify whether the occupants who sustained serious injuries had been located in the front or rear vehicle. Plaintiff's claim in this class action is that the seats are defective as to occupants of the front vehicle only. Since no analysis was presented or explanation offered, the court has no ability whatsoever to evaluate whether the number of injured parties contained in the data analyzed who were in the

rear striking vehicle is insignificant, significant, or overwhelming in numbers. Likewise, the data does not indicate any cause for the serious injuries noted. Expert Whitfield, without explanation or justification, assumes that the injury was due to the seatback position post-accident. Likewise, no information concerning speed of the vehicles is contained in the data.

Despite this mass of confounding irrelevant data contained in the database, expert Whitfield found only 35 occupants in vehicles where a front seat was fully reclined after a rear impact. Of these 35 occupants, the only vehicles whose identity was revealed in the class certification hearing record is that five of these occupants were in Saturn vehicles, which, as previously noted, is a vehicle not contained in the class. In the entire analysis, only 30 possibly relevant examples were identified and no evidence was offered which even demonstrated that any of these 30 examples were truly relevant to the class certification question because relevant to the class description.

Despite having had the opportunity to recalculate his analysis based on the 30 potential class occupants and despite the ability to precisely determine the make and model of the vehicles, no supplemental analysis was produced. Indeed, by no evidence has the plaintiff proven that any of the remaining 30 vehicles, on which Mr. Whitfield bases his entire analysis, are class vehicles. Since plaintiff's expert had the opportunity and time to conduct such an analysis and chose not to do so, it is reasonable to infer that, had such analysis been performed, it would not have been favorable to the plaintiff's position.

However, even without that reasonable factual inference, the fact that 30 vehicles of an unknown type had fully reclined seats following a rear-end collision does not provide any evidence that occupants of class vehicles sustained or didn't sustain any such injury-producing accidents. Indeed, since only a maximum 30 class vehicles of the 349 vehicles involved in rear-end collisions could possibly have had fully reclined seats post-accident, the conclusion is inescapable that at least 90 percent of class vehicles did not sustain any seatback collapse in rear impact collisions. Clearly plaintiff's expert analysis must be rejected as insufficiently related to the questions presented to determine whether commonality of issues make a class action possible.

The analysis of Dr. Joseph S. Rice, presented by the defense, must be considered and evaluated where his testimony is not inconsistent with the testimony presented by any report of plaintiff's experts and has not been brought into question by any cross-examination. Dr. Rice concludes that the risk of rear-end collision in any particular vehicle is very low, opining that more than 99 percent of the vehicles included in the class will never be involved in a rear-end collision. His opinion is that rear-impact collisions account for approximately 11 percent of all accidents but only 1.1 percent of occupants in them sustain serious injury. In his opinion, most injuries sustained in rear-end collisions are whiplash or rebound injuries where a passenger comes into contact with some portion of the interior of the front seat area, a type of injury which is irrelevant to plaintiff's claim.

Accordingly, based upon the proper analysis of all the expert reports presented and all the other evidence in

accordance with the applicable standards and burden of proof, plaintiff has failed to prove that the class vehicles contain a relevant common design, the effect of which is not transcended by all the other factors which necessarily go into designing a safe seat and determining the cause of injury.[13] Having failed to satisfy her prima facie burden that the result, in rear-end collisions, is of such uniformity due to common seatback design, the court has no need to reach the question of whether the potential risk of serious bodily injury or death is of such a significant degree as to overcome the requirement of proof of individual reliance to permit certification of a UTPCPL claim as a class action.

Although plaintiff has only a prima facie burden of proof by substantial evidence, plaintiff must nonetheless present evidence that is logically relevant to the issues in the case. Failing to do so necessarily results in plaintiff failing to meet her burden of persuasion.

For the reasons set forth above, certification of class is denied and the matter will be scheduled for individual trial.

## ORDER

And now, October 4, 2004, upon consideration of plaintiff's motion for class certification, all responses in opposition, the respective memoranda, all matters of record, and in accordance with the contemporaneous memorandum opinion, it is hereby ordered and decreed that the above certification of class is denied and the matter will be scheduled for individual trial.

---

13. Where no live testimony is presented, and no challenge to expert witness testimony is presented by cross-examination, the court is compelled to credit all non-contradicted expert opinion.

A pretrial conference as to plaintiff's individual claims is hereby scheduled for Monday, January 10, 2005, beginning at 10 a.m., in Room 530, City Hall, Philadelphia, Pennsylvania. Individual discovery may proceed.