## Scully v. Daimler Chrysler Corp.

*John K. Weston,* for plaintiff.
*Keith D. Heinold,* for defendant.

BERNSTEIN, *J.,* November 2, 2005—Plaintiffs appeal the order of September 1, 2005, denying their motion for class certification. On September 26, 2002, Daniel J. Scully filed a complaint on behalf of the class,

alleging that his engine failure in his leased Dodge Durango was caused by a defective Plenum Pan Gasket (PPG). Plaintiff's complaint alleged violation of the Unfair Trade Practices and Consumer Protection Law, misrepresentation, negligence, breach of express warranty, breach of duty of good faith and fair dealing, and breach of the implied warranty of merchantability. Count three, negligence and Count five, breach of duty of good faith and fair dealing, were dismissed through preliminary objections.

On November 15-16, 2004, the court held a hearing pursuant to Pennsylvania Rule of Civil Procedure 1707. By order dated September 1, 2005, this court denied class certification and, pursuant to Pennsylvania Rule of Civil Procedure 1710(a), accompanies its order with 'findings of fact, conclusions of law, and discussion.

## FINDINGS OF FACT

(1) The class plaintiff sought to certify was "All persons/entities who purchased or leased a vehicle equipped with an LA engine (3.9L, 5.2L and 5.9L engines installed on Daimler Chrysler Corp. vehicles between 1992 and 2002) in Pennsylvania; and all persons/entities who purchased or leased a vehicle equipped with an LA engine in another jurisdiction but attempted to have the plenum assembly remedied in Pennsylvania."

(2) During the 1990s Chrysler began using "LA engines" in many of their vehicles.

(3) The LA engine comes in a 3.9 liter, 5.2 liter, and 5.9 liter size.

(4) From 1994 through 1999, 146,780 individuals either purchased or leased a new Chrysler automobile containing an LA engine.

(5) LA engines contain a Plenum Pan Gasket (PPG). The PPG is designed to stop oil from entering the intake manifold.

(6) From 1992 through 2002, the PPG was manufactured from paper, enhanced paper, or embossed steel.

(7) If the PPG fails, a vacuum is created and oil is sucked into the intake manifold, creating a buildup in the engine's combustion chamber. The buildup mixes with fuel, lowering the fuel's octane.

(8) The lowering of the fuel's octane results in increased combustion. Increased combustion is also known as "engine knock," and is manifested as an audible rattling noise in the engine.

(9) Increased combustion can also lead to increased "blowby." Blowby refers to the collective gasses emitted from the combustion chamber. When blowby enters the crankcase of the engine, it mixes with the oil and creates contaminants.

(10) As the contaminants build up in the oil, "engine sludge" is formed.

(11) Engine sludge can build up on the intake screens. This prevents the engine from receiving proper lubrication.

(12) This lack of lubrication can ultimately lead to engine failure.

(13) In addition to the failure of the PPG, low quality fuel can cause engine sludge.

(14) In addition to the failure of the PPG, faulty ignition timing can cause engine sludge.

(15) In addition to the failure of the PPG, bad air filters can cause engine sludge.

(16) In addition to the failure of the PPG, bad oil filters can cause engine sludge.

(17) In addition to the failure of the PPG, towing heavy loads can cause engine sludge.

(18) In addition to the failure of the PPG, certain climates can cause engine sludge.

(19) In addition to the failure of the PPG, high temperatures can cause engine sludge.

(20) In addition to the failure of the PPG, infrequent oil changes can cause engine sludge.

(21) In addition, to the failure of the PPG, long idle times can cause engine sludge.

(22) In addition to the failure of the PPG, traveling at high speeds can cause engine sludge.

(23) Mr. Scully, the named plaintiff, resides in West Chester, Pennsylvania.

(24) In 1998, Mr. Scully leased a new Dodge Durango.

(25) Mr. Scully did not follow the recommended procedures for changing his oil.

(26) At or around January of 2002, an employee of the named plaintiff, while driving the Durango, was involved in a serious front end collision.

(27) The day after Mr. Scully's Durango was repaired, the engine failed.

(28) When the engine failed, Mr. Scully purchased a used engine and had it installed in his Durango.

(29) Mr. Scully used the same PPG from the failed engine in the replacement engine. The PPG on Mr. Scully's vehicle was never replaced.

(30) Mr. Scully has since sold the vehicle.

(31) Between 5 percent and 10 percent of LA engines in Chrysler automobiles will experience a PPG leak over the lifetime of the vehicle.

(32) Plaintiff's expert witnesses have seen a total of 16 LA engines with a PPG leak.

(33) None of the plaintiff's expert witnesses have seen a PPG leak in a 3.9 liter LA engine.

(34) Plaintiff's experts have not seen a leak in LA engines that use a steel PPG.

(35) None of plaintiff's witnesses have had or ever will have an opportunity to examine the PPG in Mr. Scully's Durango.

(36) None of plaintiff's experts identified what defect existed in Mr. Scully's PPG.

## DISCUSSION

The sole issue before this court was whether the prerequisites for certification as stated in Pa.R.C.P. 1702 were satisfied. Class action lawsuits are meant "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996). For a suit to proceed as a class action, Rule 1702 of the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709;

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

"In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]:

"(a) Where monetary recovery alone is sought, the court shall consider:

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action."

The burden of showing each of the elements in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.'" *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985). The moving party needs only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153-54 (Pa. Super. 2002) (quoting *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982)).

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable

claim," "substantial evidence," or evidence that creates a presumption requiring its opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element." *Commonwealth v. Martin,* 727 A.2d 1136, 1142 (Pa. Super. 1999), *alloc. denied,* 560 Pa. 722, 745 A.2d 1220 (1999). However, "The weight and credibility of the evidence are not factors at this stage." *Commonwealth v. Marti,* 779 A.2d 1177, 1180 (Pa. Super. 2001).

In the family law context, the term " 'prima facie right to custody' means only that the party has a colorable claim to custody of the child." *McDonel v. Sohn,* 762 A.2d 1101, 1107 (Pa. Super. 2000). Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the opposing party to affirmatively rebut that evidence. See *e.g., Williamsburg Community School District v. Commonwealth, Pennsylvania Human Rights Commission,* 99 Pa. Commw. 206, 512 A.2d 1339 (1986).

Courts have consistently interpreted the phrase "substantial evidence" to mean "more than a mere scintilla," but evidence "which a reasonable mind might accept as adequate to support a conclusion." *SSEN Inc. v. Borough Council of Eddystone,* 810 A.2d 200, 207 (Pa. Commw. 2002). In *Grakelow v. Nash,* 98 Pa. Super. 316 (1929), a tax case, the Superior Court said:

"To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made; . . . it attributes a specified value to cer-

tain evidence but does not make it conclusive proof of the fact in question."

Class certification is a mixed question of fact and law. *Debbs v. Chrysler Corp.,* 810 A.2d at 154 (Pa. Super. 2002). The court must consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707(c). In determining whether the prerequisites of Rule 1702 have been met, the court is only to decide who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. 1977 Explanatory comment to Pa.R.C.P. 1707. When evidence conflicts, doubt should be resolved in favor of class certification. In making a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454-55. Accordingly, this court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses and the substantive merits of defenses raised.

"The burden of proof to establish the five prerequisites to class certification lies with the class proponent; however, since the hearing on class certification is akin to a preliminary hearing, it is not a heavy burden." *Professional Flooring Co. v. Bushar Corp.,* 61 D.&C.4th 147, 153 (Montg. Cty. 2003), citing *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153-54 (Pa. Super. 2002); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). See also, *Baldassari v. Suburban Cable TV Co.,* 808 A.2d 184, 189 (Pa. Super. 2002); *Cambanis v. Nation-*

*wide Insurance Co.,* 348 Pa. Super. 41, 501 A.2d 635 (1985). The prima facie burden of proof standard at the class certification stage is met by a qualitative "substantial evidence" test.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that, decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action. *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 407, 615 A.2d 428, 431 (1992). See also, *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454, citing and quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir. 1968) ("in a doubtful case . . . any error should be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in doubtful cases any error should be committed in favor of allowing class certification." *Foust v. SEPTA,* 756 A.2d 112, 118 (Pa. Commw. 2000). This philosophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 305 Pa. Super. at 129, 451 A.2d at 454.

Within this context, the court will examine the requisite factors for class certification.

## I. *Numerosity*

To be eligible for certification, the appellant must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of

potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should plaintiffs sue individually." *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaning Co. v. Bell of Pennsylvania,* 293 Pa. Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin Inc. v. Bell Telephone Company of Pennsylvania,* 291 Pa. Super. 40, 435 A.2d 208 (1981) (204 members sufficient). Appellant need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia to the court that more members exist than it would be practicable to join." *Janicik,* 305 Pa. Super. at 132, 451 A.2d at 456.

Between 1994 and 1999, 116,089 individuals purchased and 30,691 leased a Chrysler automobile containing an LA engine. This number does not include those individuals who had their PPG gasket repaired in Pennsylvania or those who purchased or leased a Chrysler automobile in the years 2000 through 2002. 146,780 potential class members is sufficient to satisfy the numerosity requirement.

## II. *Commonality*

The second prerequisite for class certification requires "questions of law or fact common to the class." Pa.R.C.P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class oppo-

nent." *Janicik, supra* at 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). However, where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. *Janicik, supra,* 305 Pa. Super. at 133 n.5, 451 A.2d at 457 n.5.

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 452, 487 A.2d 995, 997 (1985). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. As noted by our Superior Court, "Once a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431. (emphasis in original) Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 231, 530 A.2d 499, 504 (1987).

Individual questions of fact predominate among the members of the proposed class. Plaintiffs claim that a common defect in the PPG causes the Chrysler LA engines to develop engine sludge, which ultimately leads

to engine failure. However, their own experts have testified that there is no defect common to all LA engines, and that there is variation within the LA engines themselves which makes identifying a common defect impossible. Plaintiffs' experts also testified that there are many potential causes for engine sludge other than a failed PPG.

Plaintiff is seeking to certify a class of

"All persons/entities who purchased or leased a vehicle equipped with an LA engine (3.9L, 5.2L and 5.9L engines installed on Daimler Chrysler Corp. vehicles between 1992 and 2002) in Pennsylvania; and all persons/entities who purchased or leased a vehicle equipped with an LA engine in another jurisdiction but attempted to have the plenum assembly remedied in Pennsylvania." [1]

Plaintiff's four experts have collectively seen 16 total LA engines with a PPG leak,[2] even though the potential class consists of 146,780 people.[3] Expressed as a percentage, engines with known PPG leaks constitute .01 percent of the class that plaintiff is seeking to certify.

At the class certification hearing, the plaintiff offered the deposition of Albert Motta, a Chrysler employee in the corporate quality division. Mr. Motta testified that, according to his records, between 5 percent and 10 percent of LA engines manufactured by Chrysler will en-

---

1. Pl.'s mot. for class certification, ¶18.
2. N.T., Nov. 15, 2004, vol. 1, p. 56; N.T., Nov. 16, 2004, vol. 2, pp. 14, 57, 68.
3. Pl.'s mot. for class certification, ¶25.

counter a PPG leak over the vehicle's lifetime.[4] Even if a full 10 percent of the PPGs in the LA engines failed at some point, 90 percent of the proposed class would never encounter a problem with their PPG.

Moreover, a PPG failure does not always cause a vehicle's engine to develop engine sludge, thus leading to engine failure. Plaintiff's expert, Terry Shaw testified:

"Q: So it's true is it not, Mr. Shaw, that depending on the severity of the plenum pan gasket leak, the vehicle may or may not develop engine sludge?

"A: Yes."[5]

At a minimum, 90 percent of class members will never experience engine failure and therefore will not have a cause of action, and at the very most 10 percent may experience a PPG failure over the lifetime of their vehicle. Even if the entire 10 percent experiences PPG failure, only a portion of those who experience PPG failure will also experience the buildup of engine sludge. Moreover, there is no evidence indicating that engines that develop sludge will experience any engine failure.

The plaintiff also includes 3.9, 5.2, and 5.9 liter versions of the LA engine in its proposed class definition. However, there is no design defect with the plenum pan gasket in the 3.9 liter variety of LA engine according to the testimony of plaintiff's four expert witnesses.[6] At the class certification hearing, Dr. Checkel, an engineer-

---

4. See dep. of Albert Motta, August 15, 2004, p. 13.

5. N.T., Nov. 16, 2004, vol. 2, p. 23.

6. These witnesses included Dr. Checkel, Terry Shaw, Harlan Gustafsan and Dale Cherry.

ing professor with his Ph.D. in engineering from Cambridge University, testified:

"Q: Have you ever seen a plenum pan gasket leak in a 3.9 liter engine?

"A: No." [7]

Terry Shaw, a graduate of Blaire Automotive Technical Institute, who has a Pennsylvania damage vehicle appraiser's license, testified:

"Q: Now, are you aware, Mr. Shaw, of ever seeing or hearing or reading of a plenum pan gasket failure in the 3.9 liter engine.

"A: No." [8]

Plaintiff's expert Dale Cherry, an auto mechanic who has been working on engines for 15 years, testified that the design of the 3.9 liter LA engine has a completely different plenum pan design than the other two types of engine. He agreed that he had never seen a PPG failure in the 3.9 liter LA engine:

"Q: I think you testified at your deposition, didn't you, sir, that you had never seen is a plenum pan gasket failure in a 3.9 engine?

"A: That's correct . . .

"Q: But in your opinion the 3.9 is to whatever extent, to some extent a different design?

"A: Yes." [9]

Plaintiff therefore cannot claim a common design defect is responsible for the LA engines when the 3.9 li-

---

7. N.T., Nov. 15, 2004, vol. 1, p. 56.
8. N.T., Nov. 16, 2004, vol. 2, p. 31.
9. N.T., Nov. 16, 2004, vol. 2, pp. 72, 82.

ter engine has a completely different design from the other engines. Owners of 3.9 liter engines have no defect, no problem and therefore no commonality and cannot be part of the class.

Not only are there three types of LA engine, the PPG can be made from three different materials in each engine. Plaintiff's expert Terry Shaw testified at the certification hearing that there were three different materials used to make the PPG in the LA engine. These three materials are paper, enhanced paper and embossed steel.[10] Mr. Shaw testified that PPG made from embossed steel has never failed:

"Q: Have you ever seen a failure involving the steel gasket?

"A: No."[11]

Nevertheless, LA engines equipped with an embossed steel PPG, which plaintiff's own expert admitted never fail, are included in the proposed class. Class members driving a vehicle with an embossed steel PPG cannot possibly have common issues with those class members driving vehicles equipped with a PPG made from another material.[12]

Dr. Checkel, plaintiff's only engineering expert, testified that the development of engine sludge can be from any one of 10 causes other than a failed PPG. Dr. Checkel testified that, in addition to a PPG failure, low octane fuel, faulty ignition timing, bad air filters, high temperatures, low humidity, carrying heavy loads, high engine temperature, infrequent oil changes, long idle times and

---

10. N.T., Nov. 16, 2004, vol. 2, pp. 28-30.
11. N.T., Nov. 16, 2004, vol. 2, p. 30.
12. No expert testified that the steel PPG was defective.

driving at high speeds can cause engine sludge.[13] Accordingly, each individual class member who proves that their engine failed due to engine sludge would still need to prove that the engine sludge was caused by a defective PPG, rather than one of the other 10 alternative causes.

Plaintiff's experts admit that the only way to determine whether engine sludge is caused by the PPG is by disassembling the engine:

"Q: Now, is there any way to determine, without inspecting the vehicle and taking the engine apart, what caused the formation of engine sludge?

"A: There are tests to find out some of the problems you would have. So for example, there is a diagnostic test if the engine is still running to see if you have a plenum pan gasket leak for example.

"Q: Right, but we have other causes for engine sludge right?

"A: There are other things that lead to contaminated oil and buildup of sludge, that's right.

"Q: And you can't tell without examining the vehicle and examining the engine what exactly it was that caused the formation of sludge; isn't that true?

"A: That's correct."[14]

Plaintiff's expert, Mr. Shaw agreed with Dr. Checkel:

"Q: And in order to determine whether the sludge in an engine is caused by a leaking plenum gasket, or by improper maintenance, or by some other cause, you got

---

13. See N.T., Nov. 15, 2004, vol. 1, pp. 47-49.
14. N.T., Nov. 15, 2004, vol. 1, pp. 71-72.

to take the engine apart and examine the sludge, don't you?

"A: Yes." [15]

Plaintiff has failed to demonstrate that causation can be proven on a class-wide basis as to any subclass.[16] Not only are there multiple alternative sources of engine sludge, causation must be proven on a case-by-case basis by disassembling each individual engine.

Plaintiff claims that there is a common "defect" in the LA engine which causes the PPG to leak, thereby allowing oil into the intake manifold. Plaintiff's experts, however, cannot identify what is defective in the LA engine. Dr. Checkel, plaintiff's engineer, stated the PPG problem to be one of economics:

"Q: Is a car that has an LA engine, such as we've been discussing here, in your opinion, based on your training and experience, substantially free of defects? . . .

"A: The answer is no, and I can tell you why.

"Q: Please tell me why.

"A: Any repair that costs $4,000 [to] $5,000 to repair, you're going to lose profits on dozens of cars for every one you have to repair. So if you are sustaining something like five to 10 percent failure rate in warranty, that was not a very good product for the manufacturer, never mind the person who owns it.

"Q: So it's defective because the company is going to lose money. Is that the testimony?

---

15. N.T., Nov. 16, 2004, vol. 2, p. 41.
16. No testimony whatsoever supports a claim that the 3.9 liter engine or the steel PPG are in any way defective.

"A: It's defective because the company is going to lose money while it's in warranty and the customers are going to lose money after they failed to provide the warranty. That's a defect . . .

"Q: What do you base your opinions on?

"A: That's simple economics. I guess that's maybe outside engineering but . . . ." [17]

Mr. Shaw, who is not an engineer, stated that the defect has to do with the PPG material as well as the design of the plate and the fasteners.

"Q: You've talked about a defect several times. What is the defect that you're talking about?

"A: The plenum pan gasket.

"Q: That's a part. What is the defect?

"A: Defect is that it doesn't seal.

"Q: That's a description of what is going wrong. What is the defect?

"A: The defect is that it causes the engine to self destruct.

"Q: That is the result of the description of what goes wrong. What is the defect?

"A: The design of the gasket.

"Q: What's wrong with the design?

"A: Improper selection of material.

"Q: Is that the defect or is it just the wrong thing?

"A: And the design of the plate and fasteners, the choice of materials they used.

"Q: Do you recall whether you said any of that in your three-page report?

"A: Not that specifically, no, sir.

"Q: But the defect is what, that it's the wrong material and what, that it's the wrong material for the fasteners?

"A: The gasket was insufficient for the job they had assigned to it. The fasteners, the location of the fasteners, the design of the plate which was to fasten the gasket so that it would seal the plenum was all mis-engineered and caused problems for years with that engine." [18]

Finally, Mr. Gustafsan, who is also not an engineer, stated that the defect existed in the plenum pan cover, rather than the plenum pan gasket.

"Q: Do you say in your report that the plenum pan assembly design on the LA engines was defective?

"A: Yes.

"Q: Why do you say that?

"A. I feel the cover itself was the main problem. I feel that.

"Q: What cover?

"A: The plenum pan cover. The plenum pan itself.

"Q: Would you describe for the court what the function of these different parts you're talking about?

"A: As far I'm concerned, there's three—there's four pieces to it. There is a gasket, there is a base and there is 15 bolts. I feel that the cover is not stiff enough, not rigid enough. And this spans between all the bolts, to hold constant pressure on all the areas of gasket around this periphery, around where the gasket lies.

---

18. N.T., Nov. 15, 2004, vol. 1, pp. 145-46.

"Q: How does the cover not being stiff enough promote failure of the gasket?

"A: Its design is—that is a flat plate. I feel it should either be a thicker plate or rolled up edges that's similar to the oil pan on the same engine has rolled edges to make the edge of the pan stiffer. Any way at all to make it stiffer. It really doesn't matter what you do, but it has to be stiffer so that it doesn't have unequal pressures and rises and falls around this periphery.

"Q: Well, that's my question. What does the unequal pressure do to allow the failure of the gasket?

"A: The unequal pressure allows the fluids or air, oil to leak one way or the other. It doesn't have pressure on it, it allows leakage." [19]

Plaintiff's experts do not agree on any common defect in the Chrysler LA engine. Dr. Checkel suggests the common "defect" among engines is that the manufacturer and car owners will lose money by repairing the gasket. Mr. Shaw hypothesizes that the common defect is somewhere in the gasket material and the plate and fasteners. Finally, Mr. Gustafsan says that the plenum cover is defective. One cannot prove a common defect within the Chrysler LA engine by presenting three contradictory theories.

Plaintiff's over-inclusive class, as currently defined, does not satisfy the commonality requirement. At a minimum, 90 percent of plaintiff's class will never have a problem with their PPG. Included in this 90 percent are all owners of Chrysler automobiles with 3.9 liter engines and vehicles whose LA engines contain a steel

---

19. N.T., Nov. 16, 2004, vol. 2, pp. 53-54.

PPG. By the admission of all plaintiff's experts, these class members will never experience any problems with their engine due to a defective PPG.

Those few owners of Chrysler LA engines who experienced engine sludge must show that the sludge was caused by the PPG and not by low octane fuel, faulty ignition timing, bad air filters, high temperatures, low humidity, carrying heavy loads, high engine temperature, infrequent oil changes, long idle times or driving at high speeds. To prove the PPG was faulty, each plaintiff's engine will have to be completely disassembled. This court may not certify a class of plaintiffs, alleging a class-wide defect, where at the very least, 90 percent of those individuals will never experience a problem with the "defective" part, and that each class member's engine will have to be disassembled to show the defect.

Accordingly, this court finds that individual questions of law and fact exist, and commonality has not been proven.

### III. *Typicality*

The third step in certification requires the plaintiff to show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that pursuit of their interests will advance those of the proposed class members. *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 404, 676 A.2d 1237, 1242 (1996).

Plaintiff is typical only in that he leased a Chrysler vehicle that contained an LA engine.[20] The fact that Mr. Scully, as lead plaintiff, is included in the class definition demonstrates the over-inclusiveness of the proposed class. Mr. Scully leased a new 1998 Dodge Durango in July of 1998.[21] In count four of his complaint, Mr. Scully alleges that defendant breached his express warranty. However, Mr. Scully's engine did not fail during the warranty period. The engine of his Durango failed after 52,000 miles, which is beyond the warranty period.[22]

Furthermore, the failure in Mr. Scully's engine occurred shortly after the Durango had been involved in a serious front end collision.[23] After Mr. Scully's engine failed, he had a new engine put into the Durango.[24] After replacing the engine, Mr. Scully purchased the car and subsequently traded it in.[25] No one has ever seen the original engine's PPG.[26] Mr. Scully no longer owns the vehicle, and no one has ever examined his PPG to determine if it was defective.

Mr. Scully also testified that he never experienced any engine knock.[27] However, plaintiff's expert Mr. Cherry testified that LA engines with a PPG failure will

---

20. The record does not demonstrate whether plaintiff's vehicle had a steel PPG or a 3.9 liter engine which plaintiff's experts testified were not defective.

21. N.T., Nov. 15, 2004, vol. 1, p. 96.

22. N.T., Nov. 15, 2004, vol. 1, p. 98.

23. N.T., Nov. 15, 2004, vol. 1, pp. 107, 108.

24. N.T., Nov. 15, 2004, vol. 1, p. 101.

25. N.T., Nov. 15, 2004, vol. 1, p. 114.

26. N.T., Nov. 15, 2004, vol. 1, p. 113.

27. N.T., Nov. 15, 2004, vol. 1, p. 110.

initially experience engine knock before developing engine sludge.

In addition, Mr. Scully did not follow the recommended procedures for changing his oil.[28] Dr. Checkel specifically testified that infrequent oil changes—not a failed PPG—are a cause of engine sludge.

Even if Mr. Scully was to bring an individual action claiming injury due to a defective PPG, his individual claim would fail because he would be unable to prove that his PPG was defective. No one has ever seen his PPG or will ever see the PPG that was originally installed in Mr. Scully's vehicle. A class representative cannot be typical if he cannot prove his individual case. He is certainly not typical of those class members who may in fact have a claim. His very membership in this class demonstrates the over-inclusiveness of the class definition. For the reasons stated above, the criterion of typicality contained in Rule 1702(3) has not been met by the proofs presented at the class certification hearing or the record presented therein.

## IV. *Adequacy of Representation*

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

---

28. N.T., Nov. 15, 2004, vol. 1, p. 109.

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire financial resources to assure that the interests of the class will not be harmed." Rule 1709.

"Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa. Super. at 36, 451 A.2d at 458. Here, defendants do not challenge plaintiffs' counsels' skill and therefore, the court presumes that counsel is skilled in their profession.

"Courts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa Super. at 136-37, 451 A.2d at 458. Here, defendants did not allege any conflict of interest, and the court assumes the same.

## V. *Fair and Efficient Method of Adjudication*

The final criterion under Pa.R.C.P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

It is not necessary for this court to consider these remaining requirements for certification since plaintiff has failed to establish commonality and typicality. However, the same considerations that cause commonality and typicality to fail make the matter unmanageable as a class trial.

Having weighed all class certification requirements, this court finds that a class action is not the appropriate method for adjudicating plaintiff's claims.

## CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members would be impracticable.

(2) Individual questions of fact exist with respect to the class.

(3) Plaintiff's claims are not typical of the class claims.

(4) The representatives can fairly and adequately represent the class.

(5) The case cannot be suitably managed and tried as a class action.