Jennifer E. McDONEL and Ronald W. McDonel, Jr., Appellees,

v.

Julie E. SOHN, Terry J. Spangler and Harry Leibfried.

Appeal of Terry J. Spangler.

Superior Court of Pennsylvania.

Argued Sept. 12, 2000.

Filed Nov. 14, 2000.

---

Stephen J. Dzuranin, Harrisburg, for appellant.

Max J. Smith, Hershey, for McDonel, appellees.

Before JOHNSON, TODD, and TAMILIA, JJ.

TODD, J.:

¶ 1 Terry J. Spangler appeals the order of the Dauphin County Court of Common Pleas granting shared legal custody and primary physical custody of his daughter, C.S., to her maternal aunt and uncle. After a thorough review of the record, we affirm.

¶ 2 Spangler is the natural father of C.S. In August 1992, Julie E. Sohn, the natural mother of C.S., then age 18, met Spangler, then 29, in his role as youth pastor in a church in Harrisburg. Spangler began counseling Sohn and shortly thereafter she moved in with Spangler, his wife Karen, and their three sons. During this time, Spangler and Sohn became involved in a sexual relationship and C.S. was conceived.

¶ 3 C.S. was born on May 13, 1993. In 1995, Sohn had a second child, M.S., with Harry Liebfried.[1] Sohn had a number of serious psychological problems. As a consequence, C.S. and M.S. were raised with the active involvement of Sohn's sister, Jennifer E. McDonel, and her husband, Ronald W. McDonel, Jr. (together, the "McDonels"), and C.S. and M.S. frequently stayed with them in their home. During the first 3½ years of C.S.'s life, Spangler had very limited contact with C.S. and, in fact, challenged his paternity of the child. However, in late 1996, he requested partial custody of C.S. and began seeing her approximately one weekend per month.

¶ 4 Sohn attempted to hang herself, and later died from the injury while hospitalized in March 1998. While Sohn was on life support, the McDonels filed suit for custody of C.S., instituting the present action. Shortly after Sohn's death, Spangler refused to return C.S. after one of his visitation weekends. On April 22, 1998, following a custody mediation conference, the trial court ordered that the McDonels and Spangler share legal custody and temporarily granted Spangler primary physical custody and the McDonels partial physical custody, including visits every other weekend. This same order granted the McDonels full legal and physical custody of

---

1. Liebfried, a defendant below, did not defend himself in the custody suit and is not a party to this appeal.

M.S., C.S.'s sister, whom they have since adopted.

¶5 On September 4, 1998, the Honorable Todd A. Hoover held a hearing regarding Spangler's preliminary objections which asserted that the McDonels lacked standing to bring the custody suit. Following the hearing, the court concluded that the McDonels stood *in loco parentis* to C.S. and thereby had standing to sue for custody, issuing an order to that effect on September 28, 1998. At the conclusion of a three-day hearing on the merits of the custody issue on May 5, 1999, the trial court determined that it was in C.S.'s best interest that the McDonels be granted joint legal and primary physical custody of C.S. On September 10, 1999, the trial court issued an order to that effect that also granted Spangler partial physical custody.[2] Spangler filed this timely appeal.

¶6 On appeal, Spangler raises the following issues for our review:

1. Did the trial court err in finding that the maternal aunt and uncle had established standing *in loco parentis* relative to a child without the consent or even the knowledge of the child's natural father?

2. Did the trial court err in finding that the maternal aunt and uncle established *in loco parentis* status in the face of clear evidence that they did not assume or discharge parental duties with respect to the minor child?

3. Did the trial court err in granting joint legal and primary physical custody of the child to the child's aunt

and uncle in the face of undisputed evidence that the child's natural father has had regular and continuous contact with the child for the past two and one-half years and has been the primary physical custodian for more than a year immediately prior to the hearing, during which time the child has been well cared for, has been provided a loving and stable home and where there is no evidence that the father and the child's step-mother are unfit parents?

(Brief for Appellant, at 5.)

■■■ ¶7 Our scope of review of child custody orders is broad:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.... However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*Kaneski v. Kaneski*, 413 Pa.Super. 173, 176–78, 604 A.2d 1075, 1077 (1992) (citing *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992)).

---

2. The order reads:

Plaintiffs Jennifer E. McDonel and Ronald W. McDonel, Jr. are awarded primary physical custody of [C.S.], effective immediately.

The parties shall enjoy shared legal custody of [C.S.], born May 13, 1993.

Defendant Terry J. Spangler is awarded partial physical custody as follows:

(a) Alternating weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m.;

(b) Alternating holidays of Easter, Memorial Day, Independence Day, Labor Day,

Thanksgiving and Christmas, from 6:00 p.m. the day prior to the holiday until 6:00 p.m. on the holiday, commencing with Defendant having Thanksgiving Day, 1999.

(c) The parties shall share equally the summer (June, July and August) six weeks/six weeks, commencing in the year 2000, provided written notice is afforded by Defendant to Plaintiffs no later than April 1 of the specific weeks.

(d) Fathers['] Day with the Defendant.

(e) Other times as agreed by the parties.

(Trial Court Opinion, 9/10/99, at 6.)

¶ 8 In his first and second issues on appeal, Spangler challenges the trial court's determination that the McDonels had standing *in loco parentis* to bring this custody suit. Therefore, we will address these issues together.

¶ 9 For purposes of a custody dispute, persons other than the natural parents are considered "third parties." *See Gradwell v. Strausser*, 416 Pa.Super. 118, 121–23, 610 A.2d 999, 1001 (1992). Except via dependency proceedings, third parties lack standing to seek custody as against the natural parents unless they can demonstrate a prima facie right to custody. *See id.* at 1002; *see also J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314, 1319 (1996). As we have previously stated, biological parenthood is not the only source of custody rights:

> Biological parents have a prima facie right to custody, but biological parenthood is not the only source of such a right. Cognizable rights to seek full or partial custody may also arise under statutes such as Chapter 53 of the Domestic Relations Code, 23 Pa.C.S. §§ 5311 *et seq.* (permitting grandparents and greatgrandparents to seek visitation or partial custody of their grandchildren or great grandchildren), or by virtue of the parties' conduct, as in cases where a third party who has stood in loco parentis has been recognized as possessing a prima facie right sufficient to grant standing to litigate questions of custody of the child for whom he or she has cared.

*J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 86–88, 682 A.2d 1314, 1319 (1996) (citations omitted). Here, the McDonels assert, and the trial court found, that they have standing because they stand *in loco parentis* to their niece, C.S.

¶ 10 The definition of *in loco parentis* status has been frequently repeated

by this Court and was set forth by our Supreme Court as follows:

> The phrase "in loco parentis" refers to a person who puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties.

*Commonwealth ex rel. Morgan v. Smith*, 429 Pa. 561, 565, 241 A.2d 531, 533 (1968); *see also Gradwell*, 610 A.2d at 1003 (quoting *Morgan*). We agree with the trial court that the facts of this case support a finding that the McDonels have standing *in loco parentis*.

¶ 11 At the standing hearing, Mrs. McDonel testified as to the extensive relationship they had with C.S. before Sohn's death and stated the number of days that C.S. had been with her and her husband since C.S.'s birth. (N.T. Standing Hearing, 9/4/99, at 12–13.) According to a calendar she kept, C.S. stayed with them approximately 46 days in 1993; 127 days in 1994; 200 days in 1995, including an almost continuous period from January to May 1995; 143 days in 1996; 177 days in 1997; and 50 days in 1998, through March when Spangler refused to return the child after a visit. (*Id.* at 12–13.) C.S. stayed with them for weeks at a time, including vacations and extended periods around the approximately six times that Sohn was in the hospital for psychological treatment. (*Id.* at 13–14.) While we agree with Spangler that the amount of time they spent with C.S. alone is not dispositive, we think it is nonetheless indicative of a significant relationship.

¶ 12 Further, Sohn executed a power of attorney granting *in loco parentis* powers for C.S. to Mrs. McDonel on January 25, 1995.[3] (*Id.* at 18–19; N.T. Custody Hearing, 4/22/99, at 77.) To Mrs. McDonel's

---

**3.** In September 1996, Sohn added Mr. McDonel to this power of attorney. (N.T. Custody Hearing, 4/22/99, at 77.) Sohn also signed an

*in loco parentis* power of attorney regarding M.S. directed to the McDonels. (*Id.* at 77.)

knowledge, the power was never withdrawn. (N.T. Standing Hearing, 9/4/99, at 19.) The document clearly evidences Sohn's intent and desire that the McDonels assume parental responsibility, and they acted in accordance with this power, including enrolling C.S. in school and taking her to the doctor when she was in their custody. (*Id.* at 20; N.T. Custody Hearing, 4/22/99, at 78.)

¶ 13 At the custody hearing, Stanley Schneider, Ph.D., a licensed psychologist and expert witness in custody cases,[4] testified at length regarding his observations and interviews of C.S., the McDonels, and Spangler and his wife, Karen. While we will discuss his testimony in more detail below, for purposes of our standing analysis, we note that Dr. Schneider testified that the McDonels "present a history of frequent, regular and continuing involvement with [C.S.] since her birth." (N.T. Custody Hearing, 4/22/99, at 16.) The thrust of his testimony fully supports the trial court's conclusion that they have established themselves *in loco parentis* to C.S.

■ ¶ 14 Spangler cites *Gradwell, supra,* for the proposition that "[a] third party cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship." (Brief for Appellant, at 11 (quoting *Gradwell,* 610 A.2d at 1003).) Spangler concedes that he was not aware of the role that the McDonels played in C.S.'s early life (Brief for Appellant, at 12–13); therefore, he could not have objected to their role and they could not have acted "in defiance" of his wishes. Rather, his argument appears to be that since he *now* objects to custody by them, and since he neither consented to their role nor acquiesced in it, this is sufficient to prevent a finding that they acted *in loco*

*parentis.* We reject this argument as it is clear that the cited exception from *Gradwell* refers only to situations where the natural parent's actions necessarily would conflict with a finding that a third party achieved *in loco parentis* status. Here, Spangler initially denied paternity, had little contact with C.S., and no contact with the McDonels and so could not have been an obstruction to the McDonels' developing relationship with C.S.[5]

¶ 15 The decision in *B.A. v. E.E ex rel. C.E.,* 559 Pa. 545, 741 A.2d 1227 (1999)—a case which Spangler also cites—is consistent with our conclusion. There, our Supreme Court cited *Gradwell* with approval; however, in that case, it was clear that the objecting natural parent had opposed adoption of the child and himself sought custody *from the child's birth. Id.* at 550, 741 A.2d at 1229. Thus, the third party's actions in that case were clearly "in defiance" of the parent's wishes.

¶ 16 Given the time which the McDonels spent with C.S., the *in loco parentis* power of attorney granted to them by Sohn, and the testimony of Dr. Schneider, we have no difficulty concluding that Judge Hoover did not abuse his discretion by finding that the McDonels had *in loco parentis* standing to bring this custody suit. We are unpersuaded by the cases that Spangler cites to the contrary. Moreover, we note that "the showing necessary to establish *in loco parentis* status must in fact be flexible and dependent upon the particular facts of the case." *J.A.L.,* 682 A.2d at 1320. We therefore reject Spangler's first and second issues on appeal.

■ ¶ 17 Having concluded that the McDonels have standing that is, a prima facie right to custody—we now move on to Spangler's final issue: that the trial court

---

4. The trial court noted he was familiar with Dr. Schneider, that he previously had been involved in many custody cases. (N.T. Custody Hearing, 4/22/99, at 4.)

5. It is also worth noting that were we to find, as Spangler appears to suggest, that a parent's objection to a third party's custody action defeats standing, the *Gradwell* exception would swallow the rule that third parties, in some circumstances, may have standing to sue for custody as against the natural parents.

erred in granting joint legal and primary physical custody of C.S. to the McDonels. We must first note the presumptions to be accorded a natural parent in a custody dispute with a third party and the limited weight provided by a finding of standing:

It is important to recognize that in this context, the term "prima facie right to custody" means only that the party has a colorable claim to custody of the child. The existence of such a colorable claim to custody grants standing only. In other words, it allows the party to maintain an action to seek vindication of his or her claimed rights. A finding of a prima facie right sufficient to establish standing does not affect that party's evidentiary burden: in order to be granted full or partial custody, he or she must still establish that such would be in the best interest of the child under the standards applicable to third parties.

Thus the use of the term "prima facie right to custody" in a standing inquiry must be distinguished from the use of that term in the context of determining custody rights as between a parent and a non-parent. In this latter context, the natural parent's prima facie right to custody has the effect of increasing the evidentiary burden on the non-parent seeking custody. Appropriate deference to the parent's right to custody thus does not require that all third parties be denied standing, or even that standing rules be applied in an overly stringent manner; the increased burden of proof required of third parties seeking custody rights provides an additional layer of protection for the parent.

*J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 86–88, 682 A.2d 1314, 1319 (1996) (citations omitted).

¶ 18 In custody disputes between natural parents and third parties, our Supreme Court adopted the following standard as enunciated by this Court:

When the judge is hearing a dispute between the parents, or a parent, and a third party, . . . (t)he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Ellerbe v. Hooks*, 490 Pa. 363, 367–68, 416 A.2d 512, 513–14 (1980) (quoting *In re Hernandez*, 249 Pa.Super. 274, 285–87, 376 A.2d 648, 654 (1977)). The Supreme Court clarified that "[c]learly these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." *Id.* at 368, 416 A.2d at 514. In 1995, the Supreme Court revisited this standard in *Rowles v. Rowles*, 542 Pa. 443, 668 A.2d 126 (1995). In a plurality opinion, the Court discarded the standard enunciated in *Ellerbe* in favor of one which considers parenthood "a factor of significant weight", rather that creating a presumption of a right to custody. *Id.* at 448, 668 A.2d at 128.

¶ 19 However, most recently, the Supreme Court in *B.A. v. E.E. ex rel. C.E.*, 559 Pa. 545, 741 A.2d 1227 (1999), noted that the plurality opinion in *Rowles* lacks precedential force and that the *Ellerbe* standard remains in effect:

Because the *Rowles* opinion did not command a majority of the court, the presumption that parents have a right to the custody of their children as against third parties remains in effect. Whether the parents' interest in their children is referred to as a presumption or as a factor to be weighed, however, the main

idea is that parents are to receive special consideration: as the court put it in *Ellerbe*, special weight and deference should be accorded the parent-child relationship.

*B.A.*, 559 Pa. at 549 n. 1, 741 A.2d at 1229 n. 1.

■ ¶ 20 It is with this standard in mind, and considering the special weight and deference to be accorded Spangler under *Ellerbe* and *B.A.*, that we conduct our review of the trial court's custody order.[6] We conclude that the trial court did not abuse its discretion in granting legal custody and primary physical custody to the McDonels.

¶ 21 We agree with the trial court that the testimony of Dr. Schneider was persuasive. After evaluating and interviewing C.S., the McDonels, and the Spanglers, and reviewing the documentary history available, he concluded that "I believe that from the data I collected, it would be in [C.S.'s] best interest to be in the primary custody of the McDonels." (N.T. Custody Hearing, 4/22/99, at 35.) Dr. Schneider also testified that he believed that they should share legal custody. (*Id.* at 35–36.) Further, we cannot ignore the undisputed fact that Spangler, for the first 3 ½ years of C.S.'s life, chose not to be involved with her. By contrast, as Dr. Schneider testified, the McDonels "presented a very strong case, in my opinion, reflecting their historical involvement and participation in [C.S.]'s life since birth." (N.T. Custody Hearing, 4/22/99, at 17.)

¶ 22 Dr. Schneider also expressed concern with respect to the way in which Spangler acquired custody of C.S., refus-

ing to return her to the McDonels with whom she had been living, shortly after her mother had died. This was traumatic for the child and, the trial court concluded, revealed a lack of judgment on Spangler's part. (*Id.* at 22–23, 33.) In addition, Dr. Schneider questioned Spangler's ability to care for C.S. and his other three children should his wife become unavailable to do the same. (*Id.* at 29.)

¶ 23 By living with the McDonels, C.S. will be able to continue the relationship that she has established with her sister, M.S., whom the McDonels have adopted. Dr. Schneider testified that this was a factor in his recommendation and that, in his opinion, the Spanglers were not promoting a relationship between C.S. and M.S., which would be in her best interests psychologically and emotionally.[7] (*Id.* at 33, 35.)

¶ 24 In short, we conclude that the McDonels have played a special role in the life of C.S. and agree with the following sentiments of the trial court:

> The Court considered the involvement of the McDonels in [C.S.]'s life from birth until the unfortunate death of Julie in March of 1998. Given Julie's problems, their involvement in [C.S.]'s life was extraordinary. In the Court's view, the stability that [C.S.] had was largely because of the love and care that was provided to her by Mr. and Mrs. McDonel. The number of days that they were involved with [C.S.] was significant and persuasive. Their commitment to raising [C.S.] and their willingness to accept the parental responsibility was the rea-

---

6. The trial court did not explicitly state the standard it applied; however, we have reviewed the record and conclude that the trial court's order is appropriate under the standards enunciated above.

7. We recognize that Dr. Schneider's testimony revealed some deficiencies that his report, among other things, failed to discuss the value of C.S.' relationship with her half-brothers, that her teacher reported her to be happy and well-adjusted with the Spanglers, that the

Spanglers are interested in fostering a relationship between C.S. and her maternal grandmother, and that both parties, not just the McDonels, are concerned about being kept informed about C.S. by the other. (N.T. Custody Hearing, 4/22/99, at 39–52.) However, we conclude that any such deficiencies do not affect Dr. Schneider's overall conclusion which was accepted by the trial court: that it is in C.S.'s best interests that the McDonels have primary physical custody.

son [C.S.] thrived developmentally as a young child. The McDonels['] *time, efforts* and *finances* were used in [C.S.'s] best interests. The McDonels were willing to sacrifice to help Julie, but more importantly, to the benefit of [C.S.] and [M.S.].

(Trial Court Opinion, 9/10/99, 3–4 (emphasis original).) For all the reasons expressed above, we conclude that Judge Hoover did not abuse his discretion in entering the subject custody order. Our affirmance of the trial court's order is not intended to suggest that the Spanglers are in any way unfit or are anything but loving and considerate parents. Indeed, the record makes that clear. However, under all the circumstances, we conclude that the trial court was within its discretion to issue the custody order.

¶ 25 Order affirmed.