v.

**D.B. and G.V., Appellants.**

**Appeal of: D.R.B.**

Superior Court of Pennsylvania.

Argued Feb. 26, 2014.

Filed May 2, 2014.

Martha P. Fleck, Harrisburg, for appellant.

Julie M. Cooper, Elizabethtown, for appellees.

BEFORE: GANTMAN, P.J., DONOHUE, and STABILE, JJ.

OPINION BY STABILE, J.:

Appellant D.B. ("Mother"),[1] the natural mother of E.B. (born in 2005), appeals from the August 22, 2013 order awarding primary physical custody of E.B. to Appellee D.G. ("Grandmother"), E.B.'s maternal grandmother.[2] We vacate and remand.

Appellees commenced this custody action in 2009 seeking partial physical custody of E.B. Pursuant to a January 22, 2010 agreement, Mother retained sole legal and primary physical custody, with Appellees having partial custody. On March 21, 2013, Appellees filed a modification petition requesting primary physical custody and joint legal custody of E.B. Appellees alleged, among other things, that Mother was neglecting E.B. and failing to attend to E.B.'s medical needs, including treatment for asthma and pulmonary aspergillosis. The trial court conducted hearings on July 2 and August 22, 2013, at the conclusion of which the trial court entered the order on appeal.

Mother filed this timely appeal on September 6, 2013. She raises six issues for our review. We will confine our analysis to the Mother's first two arguments, as we consider them dispositive:

1. Did the court err as a matter of law when it granted [Grandmother] standing to sue for legal and primary physical custody pursuant to 23 Pa.C.S.A. § 5324(2) as against [Mother] when [Grandmother] was unable to provide sufficient evidence at trial to warrant a granting of standing under the doctrine of *in loco parentis*?

2. Did the court err as a matter of law when it granted [Grandmother] standing to sue for legal and primary physical custody pursuant to 23 Pa.C.S.A. § 5324(3) as against [Mother] when [Grandmother] was unable to provide sufficient evidence at trial that the minor child was substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity?

Mother's Brief at 7.

■ We review the trial court's order as follows:

[T]he scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual find-

---

1. G.V., the natural father of E.B., has taken no part in these proceedings.

2. Appellees are E.B.'s maternal grandmother and step-grandfather. The trial court awarded shared legal custody to Mother and Grandmother but did not grant shared legal custody to the step-grandfather. The step-grandfather did not appeal from that order.

ings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314, 1318 (1996).

"The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of." *Id.* "The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter." *Id.* "Thus the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand." *Id.*

Moreover:

In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

*Id.* at 1318–19.

The Child Custody Act (Act), lists persons who have standing to seek child custody:

### § 5324. Standing for any form of physical custody or legal custody.

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

(3) A grandparent of the child who is not in loco parentis to the child:

(i) whose relationship with the child began either with the consent of a parent of the child or under a court order;

(ii) who assumes or is willing to assume responsibility for the child; and

(iii) when one of the following conditions is met:

(A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

(B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

(C) The child has for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324.

The trial court found that Grandmother had standing because she stood *in loco parentis* to E.B. "[T]he phrase '*in loco parentis*' refers to a person who puts himself [/herself] in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption." *Argenio v. Fenton,* 703 A.2d 1042, 1044 (Pa.Super.1997). "The status of '*in loco parentis*' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties." *Id.* "The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the

same as between parent and child." *Morgan v. Weiser*, 923 A.2d 1183, 1187 (Pa.Super.2007), *appeal denied*, 594 Pa. 680, 932 A.2d 1289 (2007). "The third party in this type of relationship, however, cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship." *Id.*

Our Supreme Court has explained *in loco parentis* status as follows:

> The *in loco parentis* basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

*T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 917 (2001).

When the party asserting *in loco parentis* status lives with the child and a natural parent as a family unit, our courts have held that the party has standing. For example, in *Bupp v. Bupp*, 718 A.2d 1278 (Pa.Super.1998), the parties (referred to herein as husband and wife) were married, divorced, and then reunited without remarrying. *Id.* at 1279. During the parties' separation, the wife became pregnant by another man. *Id.* After the parties reunited, they cared for the new baby as mother and father, and the baby's natural father played no role in the child's life. *Id.* 1279–80. The parties separated again when the child was one year old, and the husband sued for partial custody of the little girl, asserting *in loco parentis* status. This Court wrote:

> An important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent.

*Id.* at 1281. Noting that the wife encouraged the husband to assume the role of father from the time of the child's birth, and that husband accepted that role, including feeding, diapering, and playing with the child, this Court concluded he had standing to sue for custody. *Id.* at 1282.

In *T.B.*, the appellant and her girlfriend lived together in an exclusive relationship and "shared day-to-day child rearing responsibilities." *T.B.*, 786 A.2d at 915. After the parties split up, the appellant sought custody of the child, asserting that she served as a parent for three years while the parties and the child lived together as a family unit. *Id.* Our Supreme Court concluded that the appellant's three years of child rearing, which took place with the consent of the child's natural mother, were sufficient to confer *in loco parentis* standing. *Id.* at 919–20.

Likewise, in *J.A.L.*, this Court found that the appellant former lesbian life partner of the child's natural mother had standing to sue for custody. *J.A.L.*, 682 A.2d at 1322. The parties lived together as a family, the appellant was the primary breadwinner in the parties' family unit,

and the parties executed several documents indicating their intent to raise the child together. *Id.* at 1317, 1321–22. *See also, S.A. v. C.G.R.*, 856 A.2d 1248, 1249–50 (Pa.Super.2004) (spouse of natural father stood *in loco parentis* to child where the spouse assumed the role of child's mother immediately upon child's birth to a surrogate mother), *appeal denied*, 583 Pa. 678, 877 A.2d 459 (2005); *Liebner v. Simcox*, 834 A.2d 606, 609–11 (Pa.Super.2003) (step-father *in loco parentis* where he assumed the role of the step-son's father during the parties' marriage and continued to have partial custody for three years after the parties' separation).

Close relatives who assume parenting responsibilities in a time of need can also stand *in loco parentis* to a child. In *McDonel v. Sohn*, 762 A.2d 1101 (Pa.Super.2000), this Court concluded that a child's maternal aunt and uncle had standing to seek custody. The child's father had limited contact with the child during the first several years of her life, and even challenged paternity. *Id.* at 1103. The child's mother suffered from mental illness and died from injuries she sustained when she attempted to hang herself. *Id.* The child stayed with her aunt and uncle for long periods of time, during which they performed duties attendant to parenting, such as enrolling the child in school and taking her to the doctor when necessary. *Id.* at 1105–06. Before the natural mother died, she signed a power of attorney granting the aunt *in loco parentis* powers for the child. *Id.* This Court concluded the aunt and uncle had standing to sue for custody of the child.

In *Argenio*, however, this Court concluded that a grandmother did not have *in loco parentis* standing. The grandmother sought custody after the child's mother perished in a car accident and the father gave physical custody of the child to his brother and sister-in-law. *Argenio*, 703 A.2d at 1042–43. The grandmother asserted that her 16–year–old daughter and granddaughter, lived with her for the first year of the granddaughter's life. *Id.* at 1043–44. Thus, grandmother asserted that she was caring for the granddaughter on a daily basis. *Id.* This Court addressed the case as follows: "We agree with the trial court's characterization that appellant's daughter's acts of leaving her child with appellant were appropriate and were consistent with that which would be expected of a young, unwed mother who was trying to obtain an education, be productive, and continue to develop socially." *Id.* at 1044. The grandmother's actions were consistent with a babysitter or caretaker, but did not evince an informal adoption of the child and assumption of the rights and obligations of parenthood. *Id.* We concluded the record did not indicate the grandmother informally adopted the child or "intended to be bound to the legal duties and obligations of a parent." *Id.*

■ Mother argues, pursuant to *Argenio*, that Grandmother was simply a frequent caretaker or babysitter. The record reveals that E.B. and Mother have resided together throughout E.B.'s life, including two periods in 2007 (May through August) and 2009 (February through September) when Mother and E.B. resided with Grandmother. N.T., 7/2/13, at 14, 19. During the periods of combined residence, Mother and E.B. slept in a camper and spent their days inside Grandmother's house. *Id.* at 14. Also during the periods of combined residence, Grandmother provided financial assistance, did cooking and laundry for Mother and E.B., bathed E.B. and cared for E.B. while Mother was away. *Id.* at 14–15. Eventually, however, Grandmother wrote a letter seeking welfare assistance for Mother because she wanted Mother to move out. *Id.* at 20–21.

After Mother and E.B. moved out in 2009 through early 2013, Grandmother had custody of E.B. every other weekend and one night per week. *Id.* at 21. Grandmother often did not exercise the one night per week due to the distance between her home and Mother's home and due to her work schedule. *Id.* In late 2012 or early 2013, Mother lost her car and thereafter needed Grandmother's assistance in transporting E.B. to medical appointments for his lung condition. *Id.* at 22–23. Prior to that time, Grandmother occasionally helped Mother get E.B. to his appointments. *Id.* at 23–24.

In concluding Grandmother stood *in loco parentis* to E.B., the trial court reasoned that Grandmother has fulfilled a void left by E.B.'s father, who has never been involved in his life. Trial Court Opinion, 10/17/13, at 11. The trial court also relied on the two periods during which Mother and E.B. resided with Grandmother, and the first half of 2013 when Grandmother took E.B. to medical appointments because Mother had no car. *Id.* at 11–12. In addition, the trial court found that Grandmother had been doing E.B.'s laundry for most of his life, that she often called E.B. in the mornings to make sure he was awake and getting ready for school, and that she often provided meals for Mother and E.B. *Id.* Finally, the trial court found that Grandmother offered all of this assistance at Mother's request or with her acquiescence. *Id.*

The facts before us are readily distinguishable from *Bupp*, *T.B.*, and *J.A.L.* Grandmother, Mother, and E.B. plainly do not live together as an intact family unit, as was the situation in those cases. This case is also distinguishable from *McDonel*, in which the child's aunt and uncle assumed essentially all parenting responsibility when the child's mother died and the father was largely absent from the

child's life. Grandmother argues that her case for standing is stronger than that of the grandmother in *Argenio*, in that Grandmother has exercised parenting responsibilities for eight years, whereas the *Argenio* opinion indicates only that the Grandmother lived with the child daily for the child's first year of life. Grandmother's Brief at 7–8.

While we agree with Grandmother that *Argenio* is factually dissimilar, we believe the legal analysis in that case is instructive. There, the Court concluded that the grandmother's actions were consistent with helping her daughter through a period of need, but not with a *de facto* adoption of the child. *Argenio*, 703 A.2d at 1044. The same can be said here. Grandmother has played a large role in E.B.'s life, providing occasional shelter, meals, laundry, and transportation to and from medical appointments. As of the custody hearings, however, Mother and E.B. had not lived at Grandmother's residence for four years. Nothing in the record indicates that the parties ever intended for Mother and E.B. to reside permanently with Grandmother. In fact, Mother and E.B. stopped living with Grandmother in 2009 after Grandmother petitioned for welfare assistance for Mother in an attempt to get Mother and E.B. out on their own. Grandmother's efforts to assist Mother and E.B. in leaving her home are strongly inconsistent with an assumption of full parental responsibility. The periods of co-residence are more consistent with Grandmother assisting Mother and E.B. in a time of need than with Grandmother's informal adoption of E.B. The same can be said of the help Grandmother provided in transporting E.B. to his medical appointments after Mother lost her car. In summary, Grandmother's efforts on behalf of E.B. are substantial and commendable, but they are not consistent with an intent to assume all of the rights and responsibilities of parent-

hood. We therefore conclude that the trial court misapplied the law in finding that Grandmother stood *in loco parentis* to E.B. and therefore had standing to pursue this custody action.

■ Next, Mother argues that Grandmother does not have standing pursuant to 23 Pa.C.S.A. § 5324(3). The trial court, finding that Grandmother stood *in loco parentis* to E.B., did not analyze § 5324(3). In her brief, however, Grandmother argues § 5324(3) provides an alternative basis upon which we can conclude she has standing.[3] Specifically, Grandmother relies on § 5324(3)(iii)(B), which provides that a grandparent has standing if he or she is willing to assume responsibility for a child who is substantially at risk.

We observe that the language of § 5324(3)(iii)(B) is a holdover from former § 5313(b)(3) of the Act. 23 Pa.C.S.A. § 5313(b)(3) (repealed effective January 24, 2011 by Act of November 23, 2010, P.L. 1106, No. 112, § 1). In *R.M. v. Baxter,* 565 Pa. 619, 777 A.2d 446 (2001), our Supreme Court held grandparents had automatic standing to sue for custody under § 5313(b), and that proof that the child was substantially at risk was relevant to the merits of the custody action. *Id.* at 450–51. Current § 5324(3)(iii), supersedes *R.M.* on that point. That is, under § 5324(3)(iii), a grandparent must establish one of the three circumstances set forth in subsections (A) through (C) in order to have standing to seek custody.

Grandmother argues that the trial court made several findings that confer standing on her pursuant to § 5324(3)(iii)(B). The trial court wrote: "Mother has revealed herself to be too immature, 'challenged' and/or dysfunctional to handle her paren-tal duties and has often been neglectful of [E.B.'s] needs." Trial Court Opinion, 10/17/13, at 11. The trial court also noted "Mother indicated to me she possibly abused alcohol, overused prescription drugs and suffered from ongoing depression." *Id.* at 2.

We recognize the record is replete with examples of Mother's irresponsible behavior and poor parenting skills. Mother is a smoker, and Grandmother testified she has smelled smoke on E.B. N.T., 7/2/13, at 9, 15, 61–62. Mother testified, however, that she does not smoke in her apartment. *Id.* at 61–62. Mother has failed to provide a stable home life for E.B. inasmuch as she has moved five different times during E.B.'s life. *Id.* at 12.

Mother often fails to wake E.B. up and ensure that he eats breakfast and gets to school. *Id.* at 15, 29–30. Sometimes, upon arriving home from school, E.B. is locked out of his apartment and has to await Mother's return. *Id.* at 90. E.B. was absent 27½ days and tardy 4 times during the 2011–2012 school year, though Mother attributed most of those absences to his illness, which was particularly severe at the time. N.T., 8/22/12, at 32–34, 51. E.B.'s condition has been improving and requiring fewer hospital visits. *Id.* at 34.

Mother testified that she abused alcohol in 2010 after learning of E.B.'s diagnosis. N.T., 7/2/13, at 50. She testified that she went to Alcoholics Anonymous meetings to address the issue and that she has not abused alcohol since then. *Id.*

Grandmother and Mother offered conflicting testimony as to whether Mother ensures that E.B. regularly uses his pulmonary vest to treat his lung ailment. *Id.*

---

**3.** This Court can affirm the trial court on any valid basis. *In re E.M.I.,* 57 A.3d 1278, 1290 n. 6 (Pa.Super.2012).

at 9–10, 52–53. E.B. testified that he is able to put the vest on without assistance and that he does so. *Id.* at 81.

Mother's previous paramour of four years had a criminal record (aggravated assault), and she ended the relationship after a domestic violence incident. N.T., 7/22/13, at 43, 58–59. Mother was unemployed from 2008 to the summer of 2013. *Id.* at 58; N.T., 8/22/13, at 3–4, 30.

A licensed psychologist who conducted Mother's court-ordered mental health evaluation concluded that Mother's psychological issues, including paranoia, depression, and anxiety, required ongoing treatment. N.T., 8/22/13, at 45–46. Nonetheless, the psychologist testified Mother was capable of caring for E.B. and would not harm E.B. *Id.* at 47–48.

As noted above, the trial court did not analyze Grandmother's standing under § 5324(3)(iii)(B), and thus did not issue any findings to support a conclusion that E.B. is "substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity[.]" 23 Pa.C.S.A. § 5324(3)(iii)(B). Nothing in the record indicates that Mother ever abused E.B., though some of her behavior, as detailed above, is troubling. Likewise, the record is not developed enough to indicate that Mother has ongoing drug or alcohol problems. Ultimately, the trial court made no findings as to whether Mother's shortcomings put E.B. "substantially at risk."[4]

We are troubled by Mother's prolonged inability to maintain employment, her inability to wake up and make sure E.B. gets to school, and her loss. of her car that rendered her unable to drive E.B. to medical appointments. Nonetheless, we are cognizant that the court-ordered mental health evaluation established that Mother was stable enough to parent E.B. and that she was not a threat to harm him.

To analyze Grandmother's standing under § 5324(3)(iii)(B), we would have to make factual findings and assess the weight of the evidence in the first instance. On remand, the trial court should assess whether Grandmother has standing to proceed under § 5324(3)(iii)(B). At present, we have no basis upon which to conclude that Grandmother has standing to seek primary physical custody of E.B. We therefore vacate the trial court's order and remand for further proceedings consistent with this opinion.

Order vacated. Case remanded. Jurisdiction relinquished.

---

4. We are cognizant that very little case law provides guidance on the application of § 5324(3)(iii)(B) or its predecessor in § 5313(b). In *R.M.,* the child's paternal grandmother sought custody, alleging that the child was substantially at risk due to parental abuse where the mother pled guilty to endangering the child's welfare after the child was diagnosed with shaken baby syndrome. *R.M.,* 777 A.2d at 448. The trial court dismissed the grandmother's petition for lack of standing, reasoning that the child was no longer at risk because the child services agency removed him from the home and placed him with foster parents. *Id.* at 449. The Supreme Court held the grandmother had automatic standing under § 5313(b). *Id.* at 451. The Supreme Court therefore had no occasion to opine whether the child was substantially at risk.