J-A11031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| K.C. AND V.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| L.A. | |
| APPEAL OF: D.M. AND L.N. | No. 499 EDA 2015 |

Appeal from the Order January 2, 2015
in the Court of Common Pleas of Lehigh County Domestic Relations
at No(s): No. 2013-FC-0708

BEFORE: SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED JULY 15, 2016**

Appellants, D.M. and L.N., appeal from the order entered in the Lehigh County Court of Common Pleas denying their petition to intervene in a custody action between K.C. and V.C. ("Grandparents")[1] and L.A. ("Mother").[2] Appellants argue the trial court erred by denying their petition to intervene based on Appellants' status as foster parents and prohibiting Appellants from introducing evidence of their efforts to encourage a relationship between Child and her sibling. We reverse.

We glean the underlying facts from the certified record. Child was born on December 9, 2011, to Mother and Q.M. ("Father"). Mother and

---

[*] Former Justice specially assigned to the Superior Court.

[1] V.C. is Father's mother, and K.C. is V.C.'s husband, Father's step-father. For convenience, we refer to them collectively as "Grandparents."

[2] Mother did not participate in the appeal.

Father were not married. When Child was two months old, the Northampton County Children and Youth Services Agency ("CYS") filed an emergency application seeking to remove Child from Mother's custody citing, *inter alia*, Mother's failure to take Child to her follow-up doctor's visits, refusal to engage in mental health treatment, and housing instability. Order, 2/9/12, at 1.[3] On February 9, 2012, the juvenile division granted the application, adjudicated Child dependent, and transferred legal and physical custody of Child to Northampton County CYS. *Id.* at 2-3. CYS placed Child in foster care in the home of Mother's sister, D.M., and D.M.'s roommate, L.N; residents of Lehigh County. On September 20, 2012, the juvenile division continued Child's adjudication; however, it granted shared legal and physical custody of Child to Father and D.M. and L.N. Permanency Plan/Interim Order, 9/20/12.[4] At all relevant times, Father resided in the home of Grandparents in Lehigh County.[5] On April 4, 2013, the juvenile division vacated Child's adjudication of dependency. Permanency Plan/Interim Order, 4/4/13.[6] Sole legal and primary physical custody was awarded to

---

[3] The order of the juvenile court is appended to Appellants' petition to intervene as Exhibit A. Appellants and Grandparents stipulated to the exhibits appended to the petition. N.T., 9/19/14, at 7-8.

[4] The order is appended to Appellants' petition to intervene as Exhibit B.

[5] Specifically, Father moved into Grandparents' home in September 2012. N.T. at 84.

[6] The order is appended to Appellants' petition to intervene as Exhibit C.

Father, and D.M. and L.N. were awarded "periods of partial custody every other weekend from Saturday morning at 10:00 a.m. through Monday morning at 9:00 a.m." *Id.* The order further directed that "Father shall be flexible with [D.M.], Aunt, in her requests for visitation. Any further actions regarding child's custody shall be filed in Lehigh County."[7] *Id.*

On June 6, 2013, Father passed away. On June 13, 2013, Grandparents filed a complaint for custody in Lehigh County.[8] On June 25, 2013, Appellants filed a petition for intervention in the custody proceeding and emergency relief in the form of custody of Child until further order of court. Pet. to Intervene, 6/25/13, at 6-11. Grandparents filed an answer and new matter to Appellants' petition on July 31, 2013, seeking, *inter alia*, dismissal of Appellants' petition. Grandparents' Answer and New Matter, 7/31/13, at 9. Appellants filed a response on August 27, 2013. Appellants filed an amended new matter on July 29, 2014, asserting K.C. does not have

_____

[7] Review of the record indicates Mother resided in Northampton County. We further note that due to Mother's deliberate evasive efforts, the complaint for custody had to be reinstated numerous times, delaying the matter. Service was eventually effected on Mother in the Northampton County Prison. Affidavit of Service, 3/27/14, at 1-2. Prior to her incarceration, the record indicates attempts at service failed because Mother refused to answer the door or otherwise evaded service.

[8] On June 27, 2013, the parties stipulated to an interim custody arrangement providing, in part, "[D.M.], Interested Party, shall have partial physical custody of the minor child on alternating weekends from Saturday at 9:00 a.m. until Monday at 9:00 a.m. beginning Saturday, June 29, 2013." Interim Stipulation, 6/27/13, at 1 (unnumbered); *see* Trial Ct. Order, 6/27/13.

standing to seek custody. Am. New Matter, 7/29/14, at 1-2 (unnumbered). The trial court held a hearing on September 19, 2014.

D.M. testified she accompanied Mother to the hospital and was present in the room when Child was born. N.T., 9/19/14, at 14-16. She continued to have contact with Child following her birth. *Id.* at 16. In February 2012, she and L.N. were contacted by CYS regarding Child. *Id.* She described L.N. as her "roommate and she has been a family friend for many years. She also used to be very good friends with [Mother] as well." *Id.*

From February 9, 2012, until October 2012, Child spent every night with Appellants, either in their home or on family camping trips.[9] *Id.* at 18. Appellants received financial support initially from CYS for Child's care and later from Father pursuant to court order, but they expended additional resources in excess of what they received for Child's care. *Id.* at 19, 28-29. Appellants integrated Child into their families and admitted pictures into evidence of Child on outings, with members of Appellants' families, and eating her first foods. *See id.* at 19; Appellants' Ex. "P-2." In the fall of 2012, Father began having overnight visits with Child, which "started out as one night and then quickly to two nights a week." *Id.* at 35. Appellants and Father began sharing time "more equally" in December 2012. *Id.* at 36-37.

_____

[9] On cross-examination, D.M. conceded overnight visits with Father could have begun in late September or early October 2012. N.T. at 44.

- 4 -

J-A11031-16

D.M. also named Child and Child's sister as beneficiaries to her life insurance policy. *Id.* at 37.

L.N. testified that she and D.M. had "been working together as co-parents for the past four years" to another child. *Id.* at 55. She knew Mother "since 8th grade" and was at the hospital at one point during Child's birth. *Id.* at 55. She saw Child on a few occasions, including her first Christmas, prior to Child's placement with Appellants. *Id.* at 56. She detailed the frequent doctor's visits and extra nutritional considerations that Child required- which Appellants ensured were provided- because Child had been malnourished while in Mother's care and was underweight when she was placed with Appellants. *Id.* at 54-61. With regard to Mother, L.N. testified, "[w]hen [Child] was first taken, she did have some visits with [Mother]." *Id.* at 65. However, Mother stopped attending scheduled visits and "[s]he only had, maybe, two visits that she showed up for." *Id.*

V.C. testified regarding the time periods of Child's visitation with Father and that Child has been living in her home since Father's death, with every other weekend visitation with Appellants. *See id.* at 80-89. K.C. did not testify, and no evidence or testimony was elicited relative to the issue of K.C.'s standing to seek custody.

On January 2, 2015, the trial court denied Appellants' petition. The trial court reasoned: "relationships which are based on foster care do not give rise to *in loco parentis* status for purposes of custody." Trial Ct. Order,

- 5 -

1/2/15, n. 1 (citing *In re G.C.*, 735 A.2d 1226 (Pa. 1999), and *In re N.S.*, 845 A.2d 884 (Pa. Super. 2004)). Appellants filed a timely notice of appeal[10] and a Pa.R.A.P. 1925 statement[11] on January 30, 2015. The trial court authored a responsive opinion. Relying on *In re G.C.* and *In re N.S.*, the trial court concluded that because "the relationship of the [Appellants] with the child developed under the aegis of the kinship care placement by Northampton County Human Services, Children, Youth & Families Division, who stood *in loco parentis* to the child, we ruled that [Appellants] do not have standing to pursue a custody action." Trial Ct. Op., 3/3/15, at 4.

On appeal, Appellants raise the following issues for our consideration:

> 1. Whether the trial court committed an error of law by denying a petition to intervene in a custody proceeding of a maternal aunt and caregiver of a minor child on the basis that the maternal aunt and caregiver were foster parents when the evidence established the maternal aunt and caregiver established they stood *in loco parentis* to the minor child outside the foster care relationship and that

---

[10] We note this Court initially quashed Appellants' appeal as we concluded the order was not a final, appealable order. *See K.C. v. L.A.*, 128 A.3d 774, 776 (Pa. 2015). Appellants sought allowance of appeal in the Pennsylvania Supreme Court, and the Court reversed reasoning that "the order denying intervention is an appealable collateral order as of right under [Pennsylvania] Rule [of Appellate Procedure] 313[.]" *Id.* at 781.

[11] Appellants purport to file their statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Pa.R.A.P. 1925 Statement, 1/30/15, at 1 (unpaginated). Rule 1925(b) requires the party on appeal to file a statement of errors upon the trial court's direction. Pa.R.A.P. 1925(b). Rule 1925(a)(2) governs children's fast track appeals and requires the 1925 statement to be filed with the notice of appeal. Pa.R.A.P. 1925(a)(2)(i). Here, Appellants complied with Rule 1925(a)(2)(i).

the relationship was not solely based on a foster parent relationship?

2. Whether the trial court erroneously prohibited a maternal aunt and caregiver of a minor child from introducing evidence of efforts to encourage a relationship between the minor child and a sibling when it is relevant to the *in loco parentis* inquiry?

Appellants' Brief at 3.

Appellants first contend the trial court erred by denying their petition to intervene based on their status as foster parents to Child. *Id.* at 12. They argue there is no evidence of Father's objection to their custody of Child, and the fact that they were a "kinship care"[12] resource distinguishes them from foster parents whose relationship with children "began with the foster care placement." *Id.* at 19-20. We agree.

> [T]he scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual

---

[12] ***See*** 62 P.S. § 1303(b) (providing "[i]f a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives or kin.").

findings and thus, represent a gross abuse of discretion.

The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of. The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter. Thus the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand.

Moreover:

In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

The Child Custody Act (Act), lists persons who have standing to seek child custody:

**§ 5324. Standing for any form of physical custody or legal custody.**

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

(3) A grandparent of the child who is not in loco parentis to the child:

\* \* \*

23 Pa.C.S.A. § 5324.

. . . [T]he phrase '*in loco parentis*' refers to a person who puts himself [/herself] in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption. The status of '*in loco parentis*' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.

Our Supreme Court has explained *in loco parentis* status as follows:

> The *in loco parentis* basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, the presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained over a natural parent's objections.

***T.B. v. L.R.M.***, . . . 786 A.2d 913, 917 ([Pa.] 2001).

\* \* \*

Close relatives who assume parenting responsibilities in a time of need can also stand *in loco parentis* to a child. In

- 9 -

> ***McDonel v. Sohn***, 762 A.2d 1101 (Pa. Super. 2000), this
> Court concluded that a child's maternal aunt and uncle had
> standing to seek custody. The child's father had limited
> contact with the child during the first several years of her
> life, and even challenged paternity. ***Id.*** at 1103. The
> child's mother suffered from mental illness and died from
> injuries she sustained when she attempted to hang herself.
> ***Id.*** The Child stayed with her aunt and uncle for long
> periods of time, during which they performed duties
> attendant to parenting, such as enrolling the child in school
> and taking her to the doctor when necessary. ***Id.*** at 1105-
> 06. Before the natural mother died, she signed a power of
> attorney granting the aunt *in loco parentis* powers for the
> child. ***Id.*** This Court concluded the aunt and uncle had
> standing to sue for custody of the child.

***D.G. v. D.B.***, 91 A.3d 706, 707-10 (Pa. Super. 2014) (quotation marks and

some citations omitted).

In ***In re N.S.***, this Court concluded the trial court did not err or abuse

its discretion when it found a former foster mother did not have standing to

sue for custody or visitation of her former foster children, after they were

removed from the licensed foster home following allegations of abuse. ***In re***

***N.S.***, 845 A.2d at 888. Our reasoning follows:

> We likewise find unconvincing appellant's argument that
> she stood in *loco parentis* and therefore had standing to
> pursue her petition. In ***In re Adoption of Crystal D.R.***,
> . . . 480 A.2d 1146 ([Pa. Super.] 1984), wherein the foster
> parents sought termination of the parental rights of the
> children for whom they cared, the Court considered their
> argument that as caregivers they stood in *loco parentis*,
> but nonetheless concluded they lacked standing to bring
> suit. The Court reasoned the foster parents did not stand
> in *loco parentis* to the child because the state agency
> involved had responsibility for the actual care and custody
> of the child. The foster parents' rights were subordinate to
> those of the birth parents and those of the state agency
> that awarded foster care of the children to the appellants.

- 10 -

In its supplemental Opinion, the trial court herein addressed in detail the status of in *loco parentis* and its relations to appellant's demonstrated intent concerning adoption of the children.

Having reviewed the Proposed Statement of Facts and Stipulations by both parties, made part of this record, we conclude that Petitioners **were never more than foster parents**. There is no question that the [petitioners] were interested in pursuing adoption. There is also no question that the Children & Youth Agency considered changing the goal to adoption.

\* \* \*

We cannot over-emphasize the significance of the fact that the Children and Youth Agency was granted custody of all three children . . . such that the Children and Youth Agency stands *in loco parentis* to all children. There is no question that the [petitioners] discharged parental duties as foster parents, but they never assumed the obligations incident to a parental relationship. While they had physical possession of the children and therefore discharged duties as to the children's day-to-day needs, it does not follow that they are *in loco parentis* or have undertaken the rights and responsibilities that exist between parent and child.

Trial Court Opinion Hoover, J., at 4-5.

*Id.* at 887-88 (footnote omitted and emphasis added).

Instantly, the particular facts of this case demonstrate that Appellants have a direct, substantial, and immediate interest in the custody of Child and are appropriate parties to the underlying custody action. *See D.G.*, 91 A.3d at 708. Unlike the foster mother/appellant in *In Re N.S.*, Appellants had a relationship with Child preceding her placement in their home and

- 11 -

continuing after Child's dependency and custody under CYS ceased. D.M. is Mother's sister, accompanied Mother on her way to give birth to Child, and was present at the time Child was born. N.T. at 14-16. L.N. has known Mother since they were children, was present on the day of Child's birth, and saw Child on her first Christmas and on other occasions, prior to her placement with Appellants when Child was two months old. *Id.* at 55-56. Appellants share a home, and their relationship is that of "co-parents." *Id.* at 55. The unrebutted testimony established that during the time Child resided exclusively with Appellants, *i.e.*, from February 9, 2012 to September 20, 2012, Appellants fully integrated Child into their family unit. *See generally id.* at 16-76; *see also* Trial Ct. Op., 3/3/15, at 2 ("There is ample testimony to demonstrate [D.M.] and [L.N.] took care of [Child] during that period[.]"). Although Child was still adjudicated dependent, Father and Appellants were granted shared legal and physical custody of Child. Order, 9/20/12; *see* N.T. at 35-37. Significantly, Child's adjudication of dependency was **vacated** on April 4, 2013, and Appellants continued to exercise periods of partial custody, although Father had sole legal and primary physical custody. Order, 4/4/13.

Appellants' relationship pre-dated Child's placement in their home by CYS. Moreover, Appellants not only assumed and discharged the obligations incident to a parental relationship while serving as a foster placement, they **continued** to exercise partial custody while Child was **no longer**

**dependent**. *See D.G.*, 91 A.3d at 708-09. Nothing in the record suggests that Appellants' continued involvement with Child and periods of partial custody, after CYS's involvement ceased, was in **defiance** of the parents' wishes and the parent/child relationship. *See id.* at 709. Of note, Mother has actively avoided participation in the custody matter of Child and Father is deceased. We are not presented with a case where parties seek *in loco parentis* status over a natural parent's objection. *See id.* Appellants have demonstrated that the relationship they have with Child is not and was not **based** on their status as foster parents, as it existed before and after CYS' involvement and Child's adjudication of dependency. *Cf. In re N.S.*, 845 A.2d at 888-89. We conclude the Appellants demonstrated they assumed in Child's eye a parent-like stature, and the best interest of Child requires affording them the opportunity to fully litigate the underlying custody matter. *See D.G.*, 91 A.3d at 709. Therefore, we reverse the trial court's order[13] denying Appellants' petition for intervention.[14]

Order reversed. Case remanded. Jurisdiction relinquished.

---

[13] As noted **supra**, the trial court relied, in part, on the "holding" of **In re G.C.** Trial Ct. Order, 1/2/15, at 1, n.1; Trial Ct. Op., 3/3/15, at 4. The decision in **In re G.C.** was affirmed by an equally divided Court and, as such, holds no precedential value. **See Weiley v. Albert Einstien Med. Ctr.**, 51 A.3d 202, 217 n.16 (Pa. Super. 2012) (noting an affirmance by an equally divided Supreme Court does not have precedential value).

[14] Based on our resolution of Appellants' first issue, we need not address the remaining issue.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2016