J-S51009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NICOLE CHERONE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ELIZABETH HICKS | : | No. 928 MDA 2020 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MOISES PEREZ SANTIAGO | : | |

Appeal from the Order Entered April 29, 2020
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-000205-03

BEFORE:  MURRAY, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.:          **FILED: JANUARY 13, 2021**

Nicole Cherone (Appellant), the former same-sex partner of Elizabeth Hicks (Mother), appeals from the order sustaining Mother's preliminary objections after the trial court determined that Appellant did not stand *in loco parentis* to the minor child, E.C.[1]  Upon careful review, we affirm.

The trial court summarized the factual and procedural history as follows:

> [Appellant] filed an underlying Complaint for Custody on January 27, 2020, against [Mother] and [Father,] for shared legal and shared physical custody of E.C. (hereinafter, "the child") by virtue of [Appellant] standing *in loco parentis* to the child.

_____

[1] Moises Perez Santiago (Father) is the biological father of E.C. and has joined Mother's appellee brief.

[Appellant] and Mother were involved in a romantic relationship beginning in July of 2014. Mother was seventeen (17) years old at that time. In April of 2017, [Appellant] and Mother were approached by Father who offered to be a sperm donor for the couple to have a child. In return, Mother promised to carry a child for Father and his partner. Father informed [Appellant] and Mother that he did not wish to be involved in the life of the child. In May/June of 2017, Mother found out that she was pregnant and gave birth to the child in February of 2018.

[Appellant] and Mother ended the relationship in September of 2018, at which time the parties operated off an informal custody schedule with [Appellant] exercising partial physical custody of the child every Thursday evening through Sunday evening. Mother withheld custody of the child from [Appellant] beginning in June of 2019.

On or about February 14, 2020, Mother filed Preliminary Objections, wherein she alleged that [Appellant] lacked standing to sue for any form of physical or legal custody of the child. A hearing on the Preliminary Objections was scheduled for March 27, 2020, before the undersigned. Due to the COVID-19 Judicial Emergency, the hearing was rescheduled to April 27, 2020.[2]

After conducting a full hearing on preliminary objections on April 27, 2020, the undersigned granted Mother's Preliminary Objections and found that [Appellant] had not been *in loco parentis* of the child subject to the underlying custody matter for several reasons. [Appellant] filed a Petition for Permission to Appeal on June 11, 2020, and the [Superior Court] of Pennsylvania filed an Order on July 20, 2020, allowing said Petition to be treated as a Notice of Appeal.[3]

_____

[2] Appellant, Mother, and Father testified by videoconference.

[3] *See* Pa.R.A.P. 1316(a)(2) (providing that the appellate court shall treat a request for discretionary review of an order which is immediately appealable as a notice of appeal where a party has filed a timely petition for review). In addition, Appellant timely filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Trial Court Opinion, 7/31/20, at 1–3 (unpaginated).

Appellant presents four issues for our review:

I.      Whether the court erred as a matter of law and/or abused its discretion in finding Appellant did not have standing to pursue custody of the minor child having stood *in loco parentis* pursuant to 23 Pa.C.S. § 5324(2)[?]

II.     Whether the trial court erred as a matter of law and/or abused its discretion in finding that [Mother] did not consent to [Appellant] acting *in loco parentis* to the subject minor child[?]

III.    Whether the trial court erred as a matter of law and/or abused its discretion in finding that [Mother] did not intend for Appellant to act in the parental role for the child[?]

IV.     Whether the trial court erred as a matter of law and/or abused its discretion in finding the acting of [Appellant] in a parental role and performing parental duties from the conception of the child, through birth, and for a period of time following the parties' separation for a total of sixteen (16) months post-birth did not constitute a sufficient time period to establish *in loco parentis* standing[?]

Appellant's Brief at 4.

At the outset, we recognize:

Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. *K.W. v. S.L.*, 157 A.3d 498, 504 (Pa. Super. 2017). The concept of standing is vital in ensuring that cases are presented to the court by an individual who has a genuine, and not merely a theoretical, interest in the matter. Thus, the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand. *D.G. v. D.B.*, 91 A.3d 706 (Pa. Super. 2014). In *M.W. v. S.T.*, 196 A.3d 1065 (Pa. Super. 2018), this Court emphasized:

In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of

the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

*Id.* at 1069 (citation omitted).

*M.S. v. J.D.*, 215 A.3d 595, 598 (Pa. Super. 2019).

"Generally, the Child Custody Act [("Act")] does not permit third parties to seek custody of a child contrary to the wishes of that child's parents." *M.S.*, 215 A.3d at 598–599. However, the Act permits certain individuals to file a custody action, including "[a] person who stands *in loco parentis* to the child." 23 Pa.C.S.A. § 5324(2). Our Supreme Court has explained:

*In loco parentis* is a legal status and proof of essential facts is required to support a conclusion that such a relationship exists. . . . The phrase "*in loco parentis*" refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.

*C.G. v. J.H.*, 193 A.3d 891, 907 (Pa. 2018), quoting *T.B. v. L.R.M.*, 786 A.2d 913, 916–917 (Pa. 2001).

We further recognize:

The scope of review applied by an appellate court to a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that is not supported by competent evidence.

- 4 -

> **However, this broad scope of review does not vest an appellate court with the duty or privilege of making its own independent determination**. **An appellate court may not interfere with the trial court's factual conclusions unless they are unreasonable in view of the trial court's factual findings and thus represent an abuse of discretion.**

***T.B.***, 786 A.2d at 916 (citations omitted) (emphasis added).

Instantly, we address Appellant's first three issues together, because the crux of her argument in these issues is that the trial court erred and abused its discretion in determining that Mother did not consent to Appellant acting *in loco parentis* to the child during the parties' relationship and after their separation. In her fourth issue, Appellant asserts the trial court erred and abused its discretion to the extent it found she performed parental duties, but for a short period of time which did not confer standing. After careful consideration, we discern no error of law or abuse of discretion.

Referencing the record, the trial court explained:

[Appellant] lacks *in loco parentis* standing as it relates to the child subject to the underlying custody complaint for several reasons. First, *in loco parentis* standing requires there to be consent. The [c]ourt found that Mother's consent was not given as it was procured under some element of duress due to domestic violence by [Appellant] on Mother.

Mother averred in her Brief in Support of Preliminary Objections to [Appellant's] Complaint for Custody that her relationship with [Appellant] "has always been unstable with multiple breaks, instances of infidelity, and forms of abuse by [Appellant] throughout its duration." Mother also averred that she requested police be present when she informed [Appellant] on or about June 8, 2019, that she was stopping all visitation between the child and [Appellant] "as she feared for her safety."

Mother testified at the time of the hearing that [Appellant] was "manipulative . . . abusive . . . basically controlled everything [she] did." [N.T.], 4/27/20, 55:24–25. Mother testified that [Appellant] engaged in at least two (2) separate acts of physical violence towards Mother during their relationship. *Id.* [at] 56:13–16. Mother also testified that [Appellant] engaged in verbal aggression and abuse by calling Mother "worthless," a "piece of shit," a "shitty mom," "ugly," and "fat," throughout the duration of [their] relationship. *Id.* [at] 57:15–18. Furthermore, Mother testified that she was afraid of [Appellant], and as a result, the child subjected to the underlying custody matter shares [Appellant]'s last name because Mother was afraid that, if she didn't agree, "there would be repercussions." *Id.* [at] 58:12. Due to Mother's testimony regarding the abusive nature of her relationship with [Appellant], this [c]ourt found that Mother did not consent to [Appellant] having *in loco parentis* status.

The [c]ourt further found that Mother did not intend for [Appellant] to be a parental figure for the child despite [Appellant]'s intent. Mother testified that [Appellant] "was just a stepparent in [their] relationship." [N.T., 4/27/20, at] 58:17–18. After Mother and [Appellant] ended the relationship, [Appellant] "became more of a babysitter [to the child]." *Id.* [at] 59:12. Mother testified that, when [Appellant] watched the child between January and June of 2019, she was able to work and, as a result, she viewed [Appellant] much like she did [J.], another one of the child's babysitters. *Id.* [at] 64:18–65:10. Mother also testified that [Appellant] did not provide the child with any birthday gifts, Easter gifts, or Christmas gifts during the year immediately preceding January 27, 2020, when [Appellant] filed the underlying Complaint for Custody. *Id.* [at] 65:22–66:6.

[Appellant] testified that, since the parties' separation, Mother has solely taken the child to all of his speech, physical therapy and other medical-related appointments. [N.T., 4/27/20, at] 26:8–24. She also testified that Mother determined when [Appellant] could see the child. *Id.* [at] 25:20. [Appellant] admitted that she has not provided any financial support or gifts for the child since June 2019 to the present time, nor has she FaceTimed or tried to communicate with the child in any way since June 2019. *Id.* [at] 32:9–21. [Appellant] also agreed that her name is not on the child's birth certificate. *Id.* [at] 34:3–4.

Upon hearing the testimony of both [Appellant] and Mother, the [c]ourt found that, while [Appellant] intended to act as some kind of parental figure to the child, Mother did not share such intent. By way of logic then, the [c]ourt found "that there was not an intent by the parties in the aggregate — together, both parties — that there be an intent that [Appellant] be a parental figure." [N.T., 4/27/20, at] 92:18–21.

The [c]ourt also found that the time period in which [Appellant] allegedly performed parental duties was a relatively short amount of time. At most, it was from the date of the child's birth on February [ ] 2018, to either January of 2019 or June of 2019. The court found that such a period of time was primarily a babysitter/mother relationship, and accordingly, found as a finding of fact that, if [Appellant] had performed any parental duties, it was for approximately eleven (11) months. The [c]ourt found that such a short period of time served as a significant reason for denying [Appellant]'s request for standing.

Trial Court Opinion, 7/31/20, at 4–7 (unpaginated) (some citations omitted).

Our review comports with the trial court's account of the evidence. Mother testified that in July of 2014, when she was 16 years old, she began a relationship with Appellant, who was approximately 21 years old. N.T., 4/27/20, at 51. Mother described their relationship:

[Appellant] was manipulative. She was abusive. She basically controlled everything I did. She made my decisions. And I basically listened to her, whatever she said, because I didn't want . . . her abuse to continue. So I tried to do whatever she would say. . . .

*Id.* at 55–56.

Mother testified that Appellant physically abused her on two occasions. N.T., 4/27/20, at 56. Mother stated that the second incident occurred in September of 2018, when she "tried to end the[ir] relationship, and

[Appellant] repeatedly hit me in the arm."[4] *Id.* at 56–57. Notably, Appellant admitted on cross-examination that she was physically aggressive and hurt Mother on two occasions. *Id.* at 35, 47.

Mother also testified that Appellant verbally abused her. She testified on direct examination:

Q. What was the verbal aggression like?

A. Throughout the whole relationship, [Appellant] would call me worthless. She would call me a piece of shit. She would call me a shitty mom. She would tell me she hates me. She would call me ugly and fat, and pretty much those that I recall and more.

Q. Were you afraid of her?

A. Yes. I was very afraid of her.

N.T., 4/27/20, at 57. Mother stated that Appellant's verbal abuse existed "all through the relationship and after." *Id.* at 61.

On cross-examination, Appellant acknowledged the text messages introduced as exhibits by Mother, which included multiple curse words, vulgarities, and insults from Appellant to Mother. N.T., 4/27/20, at 35–37; *see also* Exhibits DH-5–DH-8, DH-10. Appellant agreed that her text messages were verbally aggressive. N.T., 4/27/20, at 37. When Mother's counsel asked Appellant whether she made similar statements *directly* to

_____

[4] Mother introduced photographs of her injury from Appellant hitting her during the second incident. N.T., 4/27/20, at 56; Exhibit DH-1.

Mother, Appellant responded, "At points I'm sure, yes." *Id.* Appellant additionally testified on cross-examination:

> Q. In all these text messages, where you're saying these negative things to [Mother], you would agree with me — I don't see any of — her saying these same things back to you?
>
> A. Correct.
>
> Q. Is that a fair statement?
>
> A. Yes.

*Id.* at 47.

> In addition:
>
> Q. And your text messages to her . . . seem pretty aggressive, this is all through your relationship. You would agree that they're aggressive text messages?
>
> A. Yes.
>
> Q. [A]nd you acknowledged being physically aggressive towards [Mother], and, obviously, this is verbally aggressive, you would agree with me that [Mother] was afraid of you?
>
> A. I guess, yes.

*Id.* at 37.

With respect to E.C.'s conception, Mother testified, "I've always wanted a child." N.T., 4/27/20, at 52. Mother explained that she had a conversation with Father regarding him being a sperm donor, and "I would have a child, and then I would give him a child." *Id.* Mother and Father entered into a written agreement on November 3, 2017. *Id.* at 22, 53. Appellant was not part of the agreement. *Id.* at 34, 53. Moreover, Appellant confirmed she

never entered into a written agreement with Mother regarding E.C. *Id.* at 33. There is no evidence that Mother ever held out Appellant as E.C.'s parent. *Id.* at 38, 67.

Mother testified that prior to the parties' separation, she and Appellant shared financial responsibility for E.C. *Id.* at 58–59. Mother testified that she and Appellant separated in September of 2018, when E.C. was approximately seven months old, and since that time, she has been the sole source of financial support for E.C. *Id.* at 59.

Mother testified she gave E.C. Appellant's surname out of fear. Mother stated Appellant "wanted [E.C.] as her own, and I was afraid if I didn't, there would be repercussions." N.T., 4/27/20, at 58. Mother responded to further questioning by the court as follows:

> THE COURT: [F]orgive me if you answered this already, but I would like to hear from you why [E.C.] was given the last name [of Appellant].
>
> THE WITNESS: Because she wanted him as her own, and I was scared of the repercussions if I didn't give him the last name, because of the abuse. So I did it because I wanted to keep peace . . .

*Id.* at 88.

Likewise, because of her fear of Appellant, Mother testified that from January to June of 2019, she agreed for E.C. to be with Appellant every Thursday through Sunday. N.T., 4/27/20, at 65. Mother explained, "I was afraid she was going to — like, her repercussions for me and the harassment I was still continuing to get from her. So to keep the peace, that's why I

decided to continue [permitting E.C. to be with her]." *Id.* Mother also testified

to Appellant babysitting. *Id.* at 64–65. She explained:

> Q. [F]rom January 2019 until June 2019, you don't dispute that [Appellant] was seeing this child from Thursday to Sunday. What did her seeing this child, what did that allow you to do during that time period?
>
> A. I was able to work.
>
> Q. And she did care for the child in some fashion?
>
> A. Yeah. She just watched him.
>
> Q. **And when she was doing that, were you considering her a mother and performing motherly duties during that time?**
>
> A. **No. She had the same role as a babysitter**. . . .
>
> Q. But she was seeing [the child] overnight and [the babysitter] wasn't seeing overnight?
>
> A. That's correct. I had to pay [the babysitter], but [Appellant] I didn't. So it's less expensive.

*Id.* (emphasis added).

Appellant testified on cross-examination about caring for E.C. from

January to June 2019:

> Q. [Y]ou had him . . . from Thursday until Sunday at some point. What time on Sunday?
>
> A. She never gave me a time. It was usually later.
>
> Q. And she controlled when the time was, correct?
>
> A. Correct.
>
> Q. **Because it was her child?**
>
> A. **(Nods head.)**

- 11 -

Q. [Y]ou [have] to answer yes or no.

A. **Yes. Sorry, yes.**

Q. **And [Mother] was using you during that time as a daycare provider for the child as a significant other — former significant other?**

A. **Correct.**

N.T., 4/27/20, at 25–26 (emphasis added).

Finally, Mother testified that E.C. is delayed in both speech and physical development. N.T., 4/27/20, at 60, 67. Mother stated that in May of 2019, E.C. was given an individualized family service plan for therapy. *Id.* at 60, 63. Mother testified as follows:

Q. Did [Appellant] go to any [of E.C.'s] doctor's appointments?

A. Not after separation, no.

Q. [S]o you had your regular pediatrician. Did you also have a . . . specialist?

A. Yes, [for] his therapy.

Q. In what was the therapy for?

A. His speech and for his physical therapy.

Q. And during that time, did [Appellant] attend to go to [*sic*] any of that?

A. No. She knew that he was getting therapy, but I never acquired [*sic*] her into it at all.

Q. And she never really pushed to be involved?

A. No.

*Id.* at 60.

Although Appellant assisted with taking E.C. to doctor appointments before the parties' separation, Appellant acknowledged that Mother made the decisions regarding E.C.'s medical care:

Q. Mother decide[d] whether he should go to the doctor or not because she was the mother?

A. Yeah.

N.T., 4/27/20, at 28.

Consistent with the foregoing, we discern no error in the trial court's factual conclusions. With regard to her legal argument, Appellant relies on our decision in *J.A.L. v. E.P.H.*, 682 A.2d 1314 (Pa. Super. 1996), where we reversed the trial court's order granting preliminary objections and dismissing the custody complaint filed by J.A.L., the former same-sex partner of E.P.H., the biological mother of the child, based on lack of *in loco parentis* status. However, in contrast to this case, J.A.L. and E.P.H. executed several legal documents while E.P.H. was pregnant and/or after the child's birth. The documents (1) appointed J.A.L. as the guardian of the child in the event of E.P.H.'s death or disability; (2) permitted J.A.L. to consent to medical or dental treatment of the child; (3) set forth a co-parenting agreement which showed the parties' intent for J.A.L. to be a *de facto* parent; and (4) in the Last Will and Testament for each party, provided for the other party and the child. *J.A.L.*, 682 A.2d at 1316–1317. Upon review, we determined that the child recognized J.A.L. "as a significant person in her life." *J.A.L.*, 682 A.2d at

1322. In addition, we opined that "E.P.H.'s rights as the biological parent do not extend to erasing a relationship between her partner and her child which she **voluntarily** created and actively fostered, simply because after the parties' separation she regretted having done so." *Id.* (emphasis added).

Conversely, the record in this case does not support a finding that E.C. recognizes Appellant as "a significant person" with whom he has a parent-child relationship. Moreover, there is no clear evidence that Mother intended Appellant to have a parent-child relationship with E.C., who was seven months old when Mother ended the relationship as a result of Appellant's coercive and abusive behavior. With respect to Mother acquiescing to E.C. having Appellant's surname, we discern no abuse of discretion by the court in determining that Mother was fearful of repercussions by Appellant if she resisted. Likewise, the record supports the court's determination that after the parties' separation in September of 2018, until June of 2019, Mother permitted Appellant to spend time with E.C. out of fear, and when Mother agreed to an informal custody arrangement from January until June of 2019, she did so because she needed a babysitter so that she — as E.C.'s sole source of financial support — could work. As such, we disagree with Appellant that *J.A.L.* is controlling.[5]

_____

[5] Based on this disposition, we need not consider Appellant's fourth issue regarding the "period of time . . . sufficient . . . to establish *in loco parentis* standing." *See* Appellant's Brief at 4.

- 14 -

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/13/2021